636 P.2d 750

**The STATE of Idaho, Plaintiff-Respondent,**

v.

**Roscoe A. KELLOGG, Defendant-Appellant.**

**No. 13096.**

Supreme Court of Idaho.

Nov. 3, 1981.

Stanley D. Crow and Conrad J. Aiken, Crow & Aiken, Boise, Roscoe A. Kellogg, pro se, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

BISTLINE, Justice.

In *Kellogg I*[1] we stated the issues there presented as follows:

"Defendant-respondent Roscoe A. Kellogg was charged with the offense of selling a prescription drug, prednisolone, without legal authority to do so, in viola-

---

1. *State v. Kellogg,* 98 Idaho 541, 568 P.2d 514 (1977).

tion of I.C. § 37–2210. On defendant's motion, the district court dismissed the information, holding that the statutory procedure by which a drug is classified as a prescription drug constitutes an unconstitutional delegation of legislative authority in violation of Idaho Constitution Art. 2, § 1, and Art. 3, § 1. The state appeals, arguing that there is no improper delegation. Defendant raises two additional issues on cross-appeal. Defendant contends that the state has failed to show that prednisolone is a prescription drug, and that because he is a naturopathic physician, he is entitled to dispense prescription drugs under the terms of the statute." 98 Idaho at 542, 568 P.2d at 515.

We reversed and remanded, holding that I.C. § 37–2210, wherein the State Board of Pharmacy for the State of Idaho was empowered to determine the status of various drugs, was not a constitutionally impermissible delegation of legislative authority. *Id.* at 545, 568 P.2d 514. We noted that "Idaho Board of Pharmacy regulation No. 18–669–181 requires prescription for some drugs, but defers to federal law to define which drugs require prescription." *Id.* at 542, 568 P.2d at 515.

In *Kellogg I* we also answered Kellogg's contention there advanced that the prosecution had not established that dispensing prednisolone requires a prescription by noting that several of the stipulated reference works (which would be introduced at trial)

denominated prednisolone as a prescription drug. *Id.* at 545, 568 P.2d at 518.

Following remand and upon trial it was established that tablets sold by Kellogg were subsequently identified as prednisolone. It was also established to the jury's satisfaction that Kellogg was not licensed as required by I.C. § 37–2210, and he was found guilty.

After remand and prior to trial, Kellogg moved the trial court for a dismissal predicated upon the premise that the state had not produced an NDA (new drug application) order governing prednisolone as a prescription drug. Kellogg relied in part upon the contents of footnote 4 to *Kellogg I* which is for convenience set forth in the margin below.[2]

■ The state submitted eleven exhibits by which it contended that the prescription status of prednisolone was satisfactorily shown. The trial court agreed with the state and ruled that such would not be an issue at trial. Kellogg challenges that determination, and others, on appeal.[3]

## I.

■ Our decision in *State v. Hobbs*, 101 Idaho 262, 611 P.2d 1047 (1980), which was handed down after Kellogg's conviction, is dispositive of the first issue. Therein four members of the Court, responding to a contention that the judgment there "must be reversed because the state did not put in any evidence of phencyclidine's classification in the Act as a controlled substance,"

**2.** "There is apparently no comprehensive list in existence which contains a complete rendition of federally designated prescription drugs. Instead, new drug application orders are kept on file at the Food and Drug Administration in Washington, D. C., and to establish conclusively that a drug has officially been designated a prescription drug, the state must obtain a certified copy of the relevant new drug application order for prednisolone." *Kellogg I*, 98 Idaho at 545 n.4, 568 P.2d at 518 n.4.

**3.** The dissent may confuse matters by characterizing as *ex parte* the affidavits brought before the Court responsive to the defendant's motion. The bearing on *defendant's* motion obviously was not *ex parte.*

Moreover no objection was made to the use of affidavits, making applicable that which the Court has often stated and recently repeated in *McNeil v. Gisler*, 100 Idaho 693, 696, 604 P.2d 707, 710 (1980):

"This Court has quite consistently adhered to the principle that an issue not raised below will not be considered when raised for the first time on appeal...

....

" 'These objections come too late: the defendants failed to object to the introduction or use of the affidavit[s] and exhibits below.' " (Quoting *Auto Drive-Away Company of Hialeah, Inc. v. Interstate Commerce Commission*, 360 F.2d 446, 448–49 (5th Cir. 1966).

*id.* at 263, 611 P.2d at 1048, held: "The question whether a substance is designated in the Act as a controlled substance is a question of law for the court, and not the jury to decide." [4] *Id.*

The only significant difference between that case and this is that phencyclidine was classified by the legislature, and its delivery criminalized, whereas here the legislature committed classification of prescription drugs to the pharmacy board, criminalizing the sale thereof by unlicensed persons. That delegation of authority was upheld in *Kellogg I.*

As we stated in *Hobbs,* the trial court will judicially notice a drug's classification, and in this instance the trial court was doing no more. The proposition before the Court was not that it be *proven* that prednisolone was a prescription drug, but rather to judicially notice that it was. Therein it was aided by the various exhibits which sufficiently demonstrated that prednisolone was indeed recognized as a prescription drug by operation of federal law. Hence we here hold that the trial court committed no error in denying the motion to dismiss and allowing the case to go to trial.

## II.

█ The second issue presented is whether the court erred in allowing the state's expert witness, Pamela Southcombe, to testify as to her opinion that the substance dispensed by Kellogg was, in fact, prednisolone. Kellogg argues that although Southcombe was admittedly an expert in the identification of drugs, she was not an expert in the identification of minerals, vitamins, enzymes or fatty acids. At trial Kellogg asserted, although he did not attempt to prove, that the substance was in fact a mineral or vitamin, and not a "drug" at all. Kellogg argues that the witness *assumed* the substance was a drug prior to testing, and that this assumption was impermissible.

The witness testified that if her assumption that the substance was a drug was incorrect, she could not say that the substance was prednisolone. We agree. (If the substance was not a drug, by definition it would not be prednisolone, which *is* a drug.) However, Kellogg submitted no evidence suggesting that the substance was not a drug. While it is the state's burden initially to prove the nature of the substance which Kellogg dispensed, testimony of Pamela Southcombe was more than adequate to do so. The fact that she began her analysis with the assumption that the substance was a drug does not detract from the relevance of the tests she performed or the conclusions which she drew from the test results.[5] Assuming a non-drug substance may theoretically give the same test results as prednisolone (something which Kellogg asserts but does not attempt to prove), the possibility of such an occurrence does not bar the jury from deciding that the evidence presented was convincing enough to persuade them, beyond a reasonable doubt, that the substance was prednisolone. As we stated in *State v. Kellogg,* 100 Idaho 483, 488–89, 600 P.2d 787, 792–93 (1979) (*Kellogg II*):

> "Substance identification is an issue of fact to be decided by the jury.... Such a challenge [to the reliability of testing procedures] goes only to the weight to be afforded Southcombe's testimony.... The credibility of witnesses and the weight to be accorded their testimony is for the jury. Where there is competent though conflicting evidence to sustain the verdict, this court cannot reweigh that evidence or disturb the verdict."

## III.

The final issue presented is whether the trial court erred in refusing to allow Kel-

---

4. A concurring opinion saw the issue there as whether the information charged a public offense, it not being contended that the unlawful delivery of phencyclidine had not been criminalized.

5. Kellogg asserts a number of additional errors which flow from the fact that Southcombe assumed that the substance was a drug. In light of our holding as to the propriety of this assumption, we need not address his additional arguments.

logg to prove that I.C. § 37–2210 is unconstitutional as applied to him. Kellogg's argument on this point begins with the fact that I.C. § 37–2210 limits the privilege of dispensing prescription drugs to several classes of qualified professionals. For Kellogg's purposes, "physicians" are the relevant privileged class. At the time that Kellogg committed the acts giving rise to the charge in this case, I.C. § 54–1802, the definitions section of the Physicians and Surgeons Act, did not contain a separate definition of physician,[6] but I.C. § 54–1803 did prohibit "practicing medicine," as that term was defined in I.C. § 54–1802, without a license. Part of the definition of "practicing medicine" was "prescribe or direct for the use of any person, sick, injured or deformed, any drug, medicine, means or appliance for the intended relief . . . of the same . . . ." I.C. § 54–1802(a). Kellogg apparently concedes that he is not a physician within the meaning of the Act because he does not hold a license from the State Board of Medicine.

Kellogg advances two contentions relative to the provisions of I.C. §§ 37–2210, 54–1802 & 54–1803. First, he argues that

*State v. Smith*, 81 Idaho 103, 337 P.2d 938 (1959), declared I.C. § 54–1802 to be unconstitutional as applied to naturopathy and that since *Smith* was the law at the time of the incident here, he cannot be convicted under a statute that rests criminal liability on the failure to obtain a license under I.C. § 54–1802. Secondly, he argues that the Idaho State Board of Medicine unconstitutionally discriminated against him in refusing to grant him a license to practice medicine.

■ As to *Smith*, that case addressed the question of whether naturopaths could be enjoined from practicing naturopathy *at all* on the basis of I.C. §§ 54–1802 & 1803. The case held that "So far as Section 54–1802, I.C., affects the practice of naturopathy, the act is unconstitutional and void. So far as it affects the branches of the healing art licensed by the statutes . . . it is valid." 81 Idaho at 110, 337 P.2d at 942. The Court characterized naturopathy as "a system of physical culture *and drugless treatment* by methods supposed to stimulate or assist nature, or to the use of physical forces such as air, light, water, heat, massage, and other similar simple materia medica . . . ." *Id.*

**6.** At the time in question the definitions section of the Act focused on the practice of medicine, and provided in part:

"54–1802. Definitions.—(a) Any person shall be regarded as practicing medicine and surgery and osteopathic medicine and surgery and osteopathy who shall advertise in any manner, or hold himself or herself out to the public, as a physician and surgeon, osteopathic physician and surgeon, doctor of osteopathy, or any of them, or who shall investigate, diagnose or treat, or offer to investigate, diagnose or treat, any physical or mental ailment or disease, real or imagined, of any person with a view to relieving the same as is commonly done by physicians and surgeons, osteopathic physicians and surgeons and doctors of osteopathy, or suggest, recommend, prescribe or direct for the use of any person, sick, injured or deformed, any drug, medicine, means or appliance for the intended relief, palliation or cure of the same, or who shall suggest, recommend, prescribe or direct an operation on any such sick, injured or deformed person or who shall perform, or offer to perform, any such operation whether or not such person receives therefor, either directly or indirectly, any fee, gift or compensation of any kind whatsoever or in any man-

ner whatsoever; provided, however, that the definition of the practice of medicine and surgery, osteopathic medicine and surgery and osteopathy, as defined above shall not be construed to include the practice by any person of a healing art which is a system or mode of treating the sick or afflicted which is, or may hereafter be, licensed under the laws of this state if the person practicing such healing art holds a license from the state entitling him to engage in the practice of such healing art, including licensed pharmacists while engaged in the practice of their profession; and provided further that the provisions of this act shall never be construed to affect in any manner the practice of the religious tenets of any church or religious belief."

In 1977 the Act was amended and the following definition of "physician" was added:

"(3) The term 'physician' means any person who holds a license to practice medicine and surgery, osteopathic medicine and surgery, or osteopathic medicine, provided further, that others authorized by law to practice any of the healing arts shall not be considered physicians for the purposes of this chapter." I.C. § 54–1803(3).

(Emphasis added.) As we stated in *State v. Maxfield*, 98 Idaho 356, 358, 564 P.2d 968, 970 (1977):

"The important difference between *Smith* and the instant case is that in *Smith* the court was confronted with an attempt to enjoin Smith from holding himself out and advertising that he was a naturopathic physician.... In that case, there were no specific practices involved which might encroach upon the practices proscribed in I.C. § 54–1802....

"While naturopathy in the abstract, as defined in *Smith*, may pose no significant threat to the public safety, specific procedures employed by a naturopathic physician may be very dangerous.... What one does, and not what one calls himself, determines whether he is practicing medicine."

Kellogg's argument that *Maxfield* overruled *Smith*, thus creating a different rule of law than was in effect at the time that Kellogg dispensed these pills, is incorrect. *Smith* cannot be read as sanctioning the dispensation of prescription drugs by naturopaths. *Maxfield* did not overrule *Smith*, it simply clarified the limits of *Smith's* holding.

■ Similarly unconvincing is Kellogg's argument that he should have been allowed to present evidence that the State Medical Board arbitrarily refuses to grant licenses to practice medicine to naturopaths. Initially, it must be noted that the court, not a jury, must be the determinor of the constitutionality of any statute or regulation. I.C. § 9–102. Assuming, however, that Kellogg intended by his motion to determine the scope of the evidence to submit the question of constitutionality to the court, we conclude that the court did not err in denying the motion.

We begin our analysis by noting that it is the legislature, not the State Board, which has determined that a degree from a medical school is a necessary prerequisite to obtaining a license to practice medicine in Idaho. I.C. § 54–1807(a) provided at the time in question that "Every person ... desiring to commence the practice of medicine and surgery ... shall make a written application to the state board .... The applicant shall transmit with said application his medical or osteopathic school diploma ...." Kellogg does not argue that his degree in naturopathy is a "medical or osteopathic school diploma" within the meaning of I.C. § 54–1807. Kellogg *does* argue, however, that the state board of medicine has discriminated against him in applying the statute by refusing to allow him to take the examination for licensure.[7] The board of medicine has interpreted I.C. § 54–1807(a)'s reference to "medical ... school diploma" in the following manner:

"An 'acceptable school of medicine' means a medical school located within the United States or Canada and designated as an approved medical school by the Liaison Committee for Medical Education Council on Medical Education, or a school of osteopathy located within the United States and designated as an approved school of osteopathy by the American Osteopathic Association, or a medical school acceptable to the board." Idaho State Board of Medicine Rules and Regulations § 1.1.3.

While this interpretation is not binding on this Court, we deem it to be a reasonable construction of I.C. § 54–1807(a), at least to the extent that it requires a diploma from an accredited medical school prior to licensure. We do not believe that the legislature intended to allow naturopaths who do not hold a license from an accredited medical school to qualify for a license to practice medicine, with all the privileges attendant to such a license. The board's interpretation of the statute, in our opinion, simply adopts the plain meaning of the words of the statute. The board, at least insofar as it requires a diploma from an accredited medical school prior to issuing a license, is simply following a statutory directive. In short, we believe that Kellogg's attack is

---

7. Kellogg admitted at trial that he has never actually applied to the board for a license. The state does not challenge Kellogg's standing to raise the constitutional issue, however.

more appropriately directed at the statute than at any action or lack thereof by the Board of Medicine.

■ We understand Kellogg's arguments as to the constitutionality of requiring a diploma from an accredited medical school to be founded upon the Due Process clauses of the United States Constitution, amend. XIV, and the Idaho Constitution, Art. I § 13.[8] We held in *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), cert. denied 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), that "the sole standard applicable to the due process provisions of the federal and state constitutions is whether the challenged law bears 'a rational relationship to the preservation and promotion of the public welfare.'" *Id.* at 866, 555 P.2d at 406 (quoting *Berry v. Koehler*, 84 Idaho 170, 177, 369 P.2d 1010, 1014 (1961).) *See State v. Cianelli*, 101 Idaho 313, 612 P.2d 550 (1980).

■ The interest of the state in setting minimum educational standards as a prerequisite to applying for a license to practice medicine seems too obvious for dispute, and indeed Kellogg does not challenge this as a legitimate object of legislative concern. Kellogg's objection goes to the means which the legislature has chosen to meet its statutory goals; he wishes to present evidence that there is no rational basis for allowing persons from accredited medical schools to apply for licenses but refusing to allow graduates of naturopathic colleges to apply

for the same license.[9] We believe that requiring accreditation is a rational means of insuring that persons applying for licenses to practice medicine meet minimum standards of competency; the possibility that some otherwise qualified persons may thereby be excluded does not make the statute irrational.[10]

We have reviewed Kellogg's other assignments of error and find them to be without merit.

Affirmed.

McFADDEN, DONALDSON and SHEPARD, JJ., concur.

BAKES, Chief Justice, dissenting:

I must dissent from the majority's decision on two grounds. First, I continue to adhere to my dissent in *State v. Kellogg*, 98 Idaho 541, 546, 568 P.2d 514, 519 (1977) (*Kellogg I*), that I.C. § 37–2210 constitutes an impermissible delegation of legislative authority and is violative of our state constitution. I.C. § 37–2210 reposes in both the federal government and the Idaho State Board of Pharmacy the power to set the standards and thereby the state policy governing the classification of drugs within Idaho. As discussed in my *Kellogg I* dissent, such a delegation of power exceeds the authority of the legislature, is unconstitutional, and should not, therefore, be recognized as a basis for this prosecution.[1]

8. Kellogg's brief refers rather vaguely to "due process" without specifying exactly what type of due process he is referring to, substantive or procedural, and without referring to the source of any such right.

9. While this argument appears to be more relevant to the equal protection clauses of the state and federal constitutions, Kellogg does not argue that the statute violates those provisions and we therefore do not address the issue.

10. It must be noted that a number of Kellogg's arguments are directed at the fact that there is no separate licensing procedure for naturopaths. This argument is separate from and different than the argument that the statute under which Kellogg was convicted is underinclusive, and cannot be raised on the facts of this case. We cannot entertain hypothetical questions as to the need for a separate licens-

ing procedure for naturopaths, specifically one which would allow naturopaths to dispense prescription drugs, in a criminal prosecution for dispensing drugs without the license required under current law. We note that the Ninth Circuit recently concluded that states are not required to provide such licenses. *See Idaho Ass'n of Naturopathic Physicians, Inc. v. United States Food and Drug Ad'm*, 582 F.2d 849, 853–54 (4th Cir. 1978), cert. denied 440 U.S. 976, 99 S.Ct. 1547, 59 L.Ed.2d 795 (1979).

1. Although I.C. § 37–2210 is applicable to this case, it should be noted that in 1979 the statute was repealed, 1979 Idaho Sess.Laws ch. 131, § 2, and replaced by provisions of the Idaho Pharmacy Act. *See* I.C. §§ 54–1705(23) and 54–1732.

Second, I find the majority's reliance on *State v. Hobbs*, 101 Idaho 262, 611 P.2d 1047 (1980), misplaced. While it is true that in *Hobbs* we permitted judicial notice of the fact that phencyclidine was a controlled substance, that was because phencyclidine was specifically listed as a controlled substance by Idaho statute, I.C. § 37–2707(e)(4). Judicial notice of that fact was appropriate under I.C. § 9–101(3) as noticing an official *act* of the state legislature. I.C. § 9–101(3) also provides for judicial notice of official *acts* of the United States Government. However, in the present case there is no official publication of a statute or regulation, state or federal, to indicate that either the State of Idaho or the federal government has acted to classify prednisolone as a prescription drug. In *Rosenau v. Idaho Mutual Benefit Ass'n*, 65 Idaho 408, 415, 145 P.2d 227 (1944), this Court clearly pointed out that judicial notice under I.C. § 9–101(3) requires an official publication of a definite governmental act or declaration creating or recognizing the fact being judicially noticed. Absent a state or federal statute or regulation specifically designating a drug as a prescription drug, the only procedure for establishing prescription status of a drug is found at 21 U.S.C.

§ 353(b)(1)(C) and –(b)(4), which requires the drug company to submit a new drug application to the FDA. The drug obtains prescription status under federal law when the FDA approves the new drug application with the limitation that the drug's label bear the statement, "Caution: Federal law prohibits dispensing without prescription." In the present case the respondent asserts that the FDA indeed approved numerous limited new drug applications for prednisolone. However, the only proof of that assertion was the affidavit of Jerome Halperin, Acting Deputy Director of the Bureau of Drugs,[2] stating that 107 new drug application letters of approval were on file. No official record of any new drug application approval appears in the record of this proceeding.[3] Therein is the distinction between this case and *State v. Hobbs, supra*. In *Hobbs*, the record consisted of the official record of the Idaho legislature, *i. e.*, the Idaho Code and Session Laws, an official source upon which the status of phencyclidine was judicially noticed. Anything other than an official record of a governmental act is insufficient to support judicial notice of that act—certainly not an affidavit. I.C. § 9–315(1) clearly requires that proof of

**2.** The affidavit stated in relevant part:

"2. ... I have custody of the official records of the FDA relating to human drugs, including the new drug applications (NDAs) on file with the FDA.

. . . .

"4. A diligent search of the official files of the FDA relating to NDAs covering prednisolone tablets for human use reveals that, as of August 1, 1977, there was on file with the FDA a total of 107 approved NDAs [New Drug Applications] submitted by manufacturers and distributors of prednisolone tablets. Attached as Exhibit 2 is a list of such holders of the approved NDAs for prednisolone tablets for human use.

"5. The time, the expense, and the manpower required to search for, and copy, each FDA letter which grants approval for the NDAs referred to in Exhibit 2 would place a burden on the FDA resources. The list of holders of approved NDAs for prednisolone tablets, attached as Exhibit 2, is provided in lieu of each FDA letter granting approval for each such NDA to demonstrate that there are on file approved NDAs for prednisolone tablets.

"6. Each of the 107 NDAs held by the firms described in the list attached as Exhibit 2 stipulates that each such drug must be labeled with the legend 'Caution: Federal law prohibits dispensing without prescription,' thereby limiting such drugs to use under the professional supervision of a practitioner licensed by law to administer such drugs."

**3.** As noted in paragraph 5 of the affidavit, note 2 *supra*, the only reason given in the affidavit of Jerome Halperin, acting deputy director of the Bureau of Drugs, as to why he had not sent certified copies of the new drug approvals was that "the time, the expense, and the manpower required to search for and copy each FDA letter which grants approval for the NDAs referred to in Exhibit 2 would place a burden on FDA resources." Certainly a copy of just one letter would not overburden the FDA. Moreover, the affidavit is self-contradictory when it states that a "diligent search" had been carried out and had discovered "107 approved NDA's submitted by manufacturers," and then later states that a search of the records would be too burdensome. Such an affidavit must necessarily be viewed as suspect.

"*Acts* . . . of the United States" be made by submitting "the records of the departments of the United States, certified by the heads of those departments respectively." Without an official record of the governmental act to be judicially noticed, it cannot be said with sufficient certainty that a judicially noticeable act has taken place. Such is particularly true when the purported act to be noticed is the issuance of an obscure letter granting new drug approval—apparently located only in the government archives in Washington, D. C.

The requirements of I.C. § 9–315(1) requiring certified copies of the new drug application approval in order to prove prednisolone's prescription status was made clear in our earlier opinion in this case, *Kellogg I,* when this Court stated the following:

> "There is apparently no comprehensive list in existence which contains a complete rendition of federally designated prescription drugs. Instead, new drug application orders are kept on file at the Food & Drug Administration in Washington, D. C., and to establish conclusively that a drug has officially been designated a prescription drug, *the state must obtain a certified copy of the relevant new drug application order for prednisolone.*" 98 Idaho at 545, n. 4, 568 P.2d at 572, n. 4. (Emphasis added.)

The majority notes this statement in footnote 2 of its opinion, but curiously omits any application, explanation or treatment of it. The majority states that various exhibits, not even identified by the majority, sufficiently demonstrated that prednisolone is recognized as a prescription drug; however, those exhibits, or any other exhibits other than a certified copy of a new drug application approval,[4] are clearly insuffi-

cient under I.C. § 9–101(3), § 9–315(1), and *Kellogg I.* In *Kellogg I* the Court distinctly said that while other evidence of prescription status could be used to establish probable cause at the preliminary hearing,[5] official proof of the drug's status would be expected at trial. 98 Idaho at 545, 569 P.2d at 572. None of the exhibits admitted in this trial, including the affidavit of Jerome Halperin, met the requirements of I.C. § 9–315(1) and this Court's admonition in *Kellogg I* that "to establish conclusively that a drug has officially been designated a prescription drug, the state must obtain a certified copy of the relevant new drug application order for prednisolone." 98 Idaho at 545, n. 4, 568 P.2d at 572, n. 4.

Particular objection must also be made to the use of the affidavit by Jerome Halperin, erroneously admitted as an exhibit, to help prove the prescription status of prednisolone. Without so much as a comment concerning the hearsay rule or the defendant's right to confrontation under the sixth and fourteenth amendments, the majority accepts the affidavit of Jerome Halperin as admissible evidence. As far as the hearsay rule is concerned, it has long been the well accepted rule that absent statutory exceptions, an affidavit is inadmissible as evidence for the lack of the opportunity to cross examine the affiant. VI Wigmore on Evidence §§ 1709, 1710 (Chadbourn Ed. 1976); 3 Am.Jur.2d, Affidavits § 29 (1962). While there are some exceptions in Idaho which permit the use of affidavits in *civil cases, e. g.,* I.R.C.P. 4(g) and 5(f) (proof of service); I.R.C.P. 43(e) (evidence on motions based on facts not appearing in the record); I.R.C.P. 56(b) (summary judgment where facts are not disputed), there appear no exceptions supporting the proposition that an affidavit such as the one in question may

---

**4.** While the court in *Kellogg I* stated that a certified "order" would be required, it seems that the official acts of the FDA relevant in this case are not even embodied in the form of an order, but rather are evidenced merely by a letter of approval. See note 2, *supra.* Nevertheless, whether approval takes the form of an order or letter, it is still clear that I.C. § 9–

315(1) and *Kellogg I* require a certified copy of an original document granting limited approval of a new drug application for prednisolone.

**5.** I.C.R. 5.1 permits "hearsay [evidence] in the form of testimony, or affidavits . . . to show the existence [of] medical facts and records" in a preliminary hearing probable cause finding.

be used as evidence to prove material elements of a criminal offense.[6]

Of even greater importance is the defendant's constitutional right to confront the witnesses against him.[7] One of the primary objectives of the confrontation clause was to prevent the use of *ex parte* affidavits, such as are sometimes used in civil cases, from being used against a defendant in lieu of a personal appearance by the witness and an opportunity by the defendant to cross examine and test the witness. *California v. Green*, 399 U.S. 149, 157–58, 90 S.Ct. 1930, 1934–1935, 26 L.Ed.2d 489 (1970); *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–340, 39 L.Ed. 409 (1895); *State v. Mee*, 102 Idaho 474, 478, 632 P.2d 663, 667 (1981). Yet, the majority has permitted exactly that, proof by affidavit which deprives the defendant of his right to cross examine the witness.

Consequently, for the above stated reasons I must dissent.

6. It might be argued that I.R.C.P. 43(e) is applicable to criminal proceedings under I.C.R. 26, and that I.R.C.P. 43(e) might be read broadly to permit the use of affidavits even to decide disputed facts. There is very little case law or comment interpreting I.R.C.P. 43(e); however, I.R.C.P. 56(b) clearly indicates that affidavits are only sufficient to decide a question where there is no issue as to the material facts. A combined reading of the two rules to restrict the use of affidavits to showing undisputed facts is consistent with the party's right to cross examine the witnesses against him. In addition, I.R.C.P. 43(e) would have to yield in any event where it conflicts with the defendant's right of confrontation in criminal cases. See discussion in text, *infra*.

7. While hearsay rules and the confrontation clause protect similar values, they are by no means congruent in their application. *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–1934, 26 L.Ed.2d 489 (1970).