828 P.2d 830

**STATE of Idaho, Plaintiff-Respondent,**

v.

**James J. CASWELL, Defendant-Appellant.**

**James Joseph CASWELL, Petitioner-Appellant,**

v.

**STATE of Idaho, Respondent.**

**Nos. 18722, 18840.**

Supreme Court of Idaho,
Twin Falls, Nov. 1991 Term.

Feb. 19, 1992.

Rehearing Denied May 5, 1992.

M. Lynn Dunlap, Jerome County Public Defender, Twin Falls, for defendant-appellant.

Larry J. EchoHawk, Atty. Gen., Michael A. Henderson, Deputy Atty. Gen., argued, Boise, for plaintiff-respondent.

BAKES, Chief Justice.

Appellant James Caswell appeals from a conviction for delivery of methamphetamine and from the district court's order denying his motion for a new trial. In a separate case, Caswell appeals the district court order dismissing his petition for post-conviction relief. These two cases were consolidated on appeal.

James Caswell was charged in a two-count information with possession and delivery of methamphetamine, a Schedule II narcotic, to an undercover narcotics agent. Before trial, Caswell filed a discovery request, asking for "results or reports of ... scientific tests or experiments made in connection with this particular case ... within the possession ... of the prosecuting attorney by the exercise of due diligence." In response the State supplied Caswell with a report prepared by criminalist Donald Wyckoff, who tested the substance Caswell gave to the undercover officers and determined that it contained methamphetamine. At trial Caswell objected to the introduction of this report, claiming that the State had failed to provide him with the working papers or graphs from which Wyckoff drew his conclusion that the tested substance was methamphetamine. The State acknowledged at trial that these documents had not been provided to Caswell earlier, but that they had been provided to him at trial. Once Caswell had the documents, the trial court allowed a recess, from approximately 3:00 p.m. until 10:00 a.m. the next morning, for Caswell's attorney to review them and, if necessary, find his own expert. Ultimately the trial court admitted the results of the test into evidence, ruling that the State had sufficiently complied with the discovery request five months earlier when it provided Caswell with Wyckoff's final lab report. The court further ruled that Caswell should have requested further information, or retained his own expert to run tests on the substance, if he felt he needed further information.

In his testimony at trial, Wyckoff identified the substance as methamphetamine, but he did not testify as to the effect

methamphetamine has on the central nervous system, nor did the State present any other evidence as to that effect. At the close of trial, the jury found Caswell guilty on both charges, possession and delivery of methamphetamine. Caswell moved for judgment of acquittal or a new trial, claiming, among other things, that the verdicts were against the weight of the evidence, that Count I, possession of a controlled substance, was a lesser included offense of Count II, delivery of a controlled substance, and that Wyckoff's testimony should have been excluded and that the trial court did not allow Caswell sufficient time to prepare a defense to the test results which were not disclosed until trial. The district court dismissed the charge in Count I for possession of a controlled substance, holding that Count I was a lesser included offense of the delivery charge in Count II. The court denied all other motions and entered a judgment of conviction on Count II, the delivery charge. Caswell appealed from the entry of final judgment.

Caswell then filed a petition for post conviction relief, claiming that the State had failed to live up to an agreement it made with Caswell prior to trial. Caswell offered testimony at the hearing regarding an agreement in which the State, through an Idaho Bureau of Narcotics (IBN) agent, agreed to dismiss the charges against Caswell if Caswell provided the IBN with the names of ten drug dealers or distributors and performed controlled buys on behalf of the IBN. After Caswell presented his evidence, the State moved for a directed verdict, which the district court granted, holding that an IBN agent had no authority to bind the prosecuting attorney to a plea agreement. Caswell also appeals from this district court ruling. The two appeals were consolidated.

On appeal, we are asked to resolve the following issues:

1. During defense counsel's rebuttal argument, the following exchange occurred:

> JUSTICE JOHNSON: Mr. Dunlap, before you launch into your rebuttal, I would appreciate knowing if you can identify where in the record the issues concerning the Schedule III substance and the additional element of proof that you now argue was required, that is of

1. Did I.C. § 37–2707(d) require the State to prove, and did it fail to prove, that the methamphetamine found within the substance which the defendant delivered to the agents had a stimulant effect on the central nervous system?

2. Did the State fail to comply with Caswell's discovery request, such that the trial court should have excluded criminalist Don Wyckoff's testimony?

3. Did the district court err in finding that an IBN agent cannot bind the State to a plea negotiation?

■ Regarding the first issue, whether I.C. § 37–2707(d) required the State to prove that the methamphetamine which Caswell delivered to the agents had a stimulant effect on the central nervous system, defense counsel admitted at oral argument that he had failed to raise this issue at trial.[1] In such a situation, where the issue was not raised below, we will not consider it on appeal. *State v. Martin,* 119 Idaho 577, 808 P.2d 1322 (1991); *State v. Kellogg,* 102 Idaho 628, 636 P.2d 750 (1981); *Lockard v. State,* 92 Idaho 813, 451 P.2d 1014 (1969).

We next consider Caswell's contention that the State did not adequately respond to Caswell's discovery request that the State furnish "results or reports of ... scientific tests or experiments made in connection with this particular case...." In response to this request, the State, some five months before trial, had provided Caswell with Wyckoff's report, Exhibit C, containing his test results and conclusions. It did not provide the working papers and graphs on which the conclusions in the report were based until requested at trial.

■ The trial court found that the State's providing the test results, Exhibit C, was adequate. We find no error in the

> the stimulant effect of methamphetamine, was raised before the trial court. I am not able to identify in the record where those issues were raised.
>
> MR. DUNLAP: Sir, those issues were not raised at the trial court. There is no argument about that.

**804**

trial court's conclusion. Even assuming, however, that the State's original response was inadequate, we find no abuse of discretion in the trial court's conclusion that Caswell's failure for five months to pursue the matter further and request more specific test information, such as the computer printout, or to obtain his own expert and request that a portion of the remaining contraband be submitted to his own expert, precludes him from complaining about any perceived inadequacy of the State's response. *People v. Janke,* 720 P.2d 613 (Colo.App.1986) (Trial court did not abuse discretion by denying defendant's motion for a continuance where "defense counsel had ample time and opportunity to prepare adequately"); *Begley v. Municipality of Anchorage,* 711 P.2d 540, 543 (Alaska App. 1985) ("Even if [defendant] had made a showing that the ... testimony would be relevant to her defense ... [the trial court] could have correctly concluded that [defendant] had not been diligent in pursuing this line of defense"); *Clark v. State,* 704 P.2d 799 (Alaska App.1985); *People v. Cornelius,* 41 Colo.App. 182, 585 P.2d 295 (1978); *State v. Maxwell,* 103 Ariz. 478, 445 P.2d 837 (1968). Caswell had five months from the time the State provided Wyckoff's test results and conclusions until trial to request further information from the State. Given that significant amount of time in which Caswell could have acted, he cannot wait to raise the issue of the inadequacy of the State's response by merely objecting at trial when the State's witness is called to testify. We conclude that the trial court did not err by allowing Wyckoff to testify and by admitting the test results as evidence.

Finally, we consider Caswell's argument that the district court erred in concluding that an IBN agent has no authority to bind the state, thereby dismissing his petition for post-conviction relief. Caswell argues that, in this case, the IBN agent did have authority to bind the State to his alleged promise that the charges against Caswell would be dismissed if Caswell performed certain narcotics buys on behalf of the IBN and gave the IBN the names of ten persons involved in dealing drugs. The State, on the other hand, argues that even if Caswell had presented credible evidence that the IBN agent entered into such an agreement with Caswell, which it denies, the IBN agent had no authority to enter into such an agreement and that such an agreement is not binding on the State. We agree with the State's argument.

We first point out that this case does not involve a plea bargain arrangement, in which Caswell would have pleaded guilty to something less than the crime or crimes charged in exchange for his cooperation with the IBN. Instead, Caswell claims that the IBN agent agreed to have all charges against Caswell dismissed in exchange for certain cooperation on his part.

■ The Idaho statute clearly spells out who has authority to dismiss a pending action. I.C. § 19–3504 provides that a district court "may, either of its own motion or upon the application of the prosecuting attorney, ... order an action or indictment to be dismissed." The statute *only* gives authority to the district court to dismiss felony charges against an accused; a prosecutor has no independent authority to dismiss a felony case but may only recommend to the court that an action be dismissed. If a prosecutor does not have authority to agree to dismiss an action, an IBN agent certainly has no such authority. *See Application of Parham,* 6 Ariz.App. 191, 431 P.2d 86, 88 (1967) ("We hold that such promises [to dismiss all charges if a defendant helps in a criminal investigation], if made by police officers are unenforceable, as being beyond the scope of authority of such officers"); *United States v. Williams,* 780 F.2d 802, 803 (9th Cir.1986) ("In general, a promise made by a government employee other than the United States Attorney to recommend dismissal of an indictment cannot bind the United States Attorney").

In *Turk v. State,* 662 P.2d 997 (Alaska App.1983), the Alaska court also determined that if a defendant did not detrimentally rely on an alleged plea agreement, there can be no specific enforcement.

The record is unclear regarding the alleged plea agreement between the defendant and the state. It appears that some kind of agreement may have been reached, but it is unclear what the terms of that agreement might have been. The trial court made no specific finding of fact regarding an agreement between the parties. Turk concedes, nevertheless, that he did not detrimentally rely on any representation by the state and did not give up anything of value in return for the agreement. Consequently, even if we assume *arguendo* that an agreement existed, we would not grant specific enforcement. While a defendant is entitled to a remedy if the state breaches a plea agreement, the customary remedy is permission for the defendant to withdraw his plea and proceed to trial. *Here no plea was entered and Turk was tried. Under these circumstances, Turk's requested relief is unwarranted.*

662 P.2d at 999–1000 (emphasis added). *See also, State v. Jones*, 751 P.2d 1379 (Alaska App.1988) ("In the absence of actual legal prejudice to the defendant, the adverse consequences [broken travel arrangements, emotional distress] relied on by [the trial court] as a basis for dismissal ... are simply too remote and tangential in nature to justify the exercise of the court's dismissal power...."); *Johnson v. Lumpkin*, 769 F.2d 630 (9th Cir.1985); *U.S. v. Kettering*, 861 F.2d 675 (11th Cir.1988); *U.S. v. Hudson*, 609 F.2d 1326 (9th Cir. 1979).

Even if a plea bargain had existed in this case, Caswell has made no showing that he relied on any agreement to his detriment. He argues that his cooperation in providing a list of names and making appointments to complete a "buy" of narcotics put him in personal jeopardy. However, Caswell has not shown, or even attempted to show, whether the State made use of the information he provided and, if so, if the State's use of the names Caswell provided would in any way place him in jeopardy. As in *Turk*, Caswell never entered a plea of guilty pursuant to a plea bargain with the state. Therefore, he has not shown any prejudice. Accordingly, the trial court did not err in dismissing Caswell's petition for post-conviction relief.

The district court decision is affirmed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, concurring in part and dissenting in part.

I concur in the majority's resolution of the issues raised in Caswell's direct appeal. I also concur in the majority opinion as to the issue raised in the petition for post conviction relief to the extent that it holds that under I.C. § 19–3504 the State does not have the authority to dismiss the case against Caswell. However, in my view, the district court's order dismissing the petition should be reversed and the case remanded for a new hearing to determine whether the State should be required to recommend dismissal.

The evidence relating to the agreement to dismiss is as follows. Caswell testified that after he was arrested, Agent Peterson of the IBN contacted him in jail and said, "If you can bail out, give me a telephone call, we'll work with you." When Caswell posted bail, he set up an appointment with IBN and met with Agent Beatty at the IBN offices. Caswell's friend Valenda Pickett was also at the meeting. Beatty wanted Caswell to set up three controlled narcotics buys. Beatty also said that two buys would be enough if one of them was from a narcotics laboratory. In exchange, Beatty told Caswell that all charges would be dropped.

A second meeting was arranged where Caswell would supply Beatty with the names of ten people Caswell might be able to set up. At this meeting, Beatty said that he had been authorized by John Horgan, the Jerome County Prosecuting Attorney, to enter into this deal with Caswell. "Well, I've talked to Mr. Horgan. I've talked to people over there. And they are willing to go along with it."

Pickett testified and corroborated Caswell's testimony. Other testimony established that it was a regular practice for the IBN to recruit defendants as undercover

agents in exchange for promises to dismiss or reduce charges against the defendants.

The next week when Caswell presented his list of ten "possible victims," Beatty left the room saying he was going to check the names on his computer. When Beatty returned he said, "Well, get a hold of me next Wednesday when you contact some people, and we'll get it done."

After the meeting, Caswell diligently made arrangements for three controlled buys, one of which was to take place that Wednesday. Caswell called Beatty at 1:00 Wednesday afternoon. Agent Mark Denart answered the telephone and told Caswell that Beatty was out of town and asked if he could help. After Caswell explained that he had a deal with Beatty and that he was ready to fulfill his part of the deal, Denart said he would call Caswell "right back."

Five minutes later Denart telephoned Caswell. Caswell told him that he had a buy set up for that night. Denart told Caswell to be at the IBN office by five o'clock in order to prepare for the buy. At ten minutes to five, Denart called again and said, "Sorry. We can't help you. You'll have to take your chances in court now, you know."

At the end of Caswell's evidence the State moved for a directed verdict. The district court granted the motion stating that "since there is no showing that Mr. Horgan or Mr. Gold or anyone in charge in Jerome County, where the crime was committed, entered into such a bargain, you have got nothing. So the petition is denied."

### I

A petition for post conviction relief is civil in nature. "All rules and statutes applicable in civil proceedings including pre-trial, discovery and appellate procedures are available to the parties." I.C. § 19-4907. As noted above, at the end of Caswell's case, the district court granted the State's I.R.C.P. 50(a) motion for a directed verdict. Our standard of review of the grant of motions for directed verdicts is as follows: "Whether a verdict should be

directed ... is purely a question of law and on those questions, the parties are entitled to full review by the appellate court without special deference to the views of the trial court." *Quick v. Crane,* 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986).

### II

The district court was mistaken when it said that there was no evidence that the Jerome County prosecutor entered into a bargain with Caswell. Both Pickett and Caswell testified that Beatty said he spoke to Prosecuting Attorney John Horgan who gave his permission to enter into the agreement. The out of court statements of Beatty and Horgan are not hearsay statements because they are admissions by a party-opponent which are excluded from the hearsay rule. I.R.E. 801(d)(2). Additionally, Pickett and Caswell's testimony was admitted without objection from the State.

In this respect, *United States v. Williams,* 780 F.2d 802 (9th Cir.1986), cited by the majority, is easily distinguished. In *Williams,* there was *no* evidence presented by the defendant that the United States Attorney Office agreed to recommend dismissal of the charges if Williams cooperated with a Veterans Administration investigation. By contrast, in this case there was evidence from two witnesses that Prosecuting Attorney John Horgan had approved the agreement between Caswell and Beatty.

In light of the direct evidence of an agreement between Caswell and the Jerome County Prosecuting Attorney, the district court's reason for granting the motion for directed verdict is simply wrong and the motion never should have been granted on that basis.

### III

The majority affirms the trial court's decision on an additional basis not mentioned by the district court. It holds that the agreement cannot be binding upon the State because the State does not have the statutory authority to dismiss cases.

The majority is only partially correct. It is a fact the State does not have the authority to dismiss a case. Idaho Code § 19–3504 clearly states that only the court may dismiss a case. However the conclusion the majority draws from that fact does not logically follow.

The majority's argument is this: 1) the agreement was to dismiss the case, 2) neither the prosecutor or the IBN can dismiss a case on its own, 3) therefore the agreement is totally void.

However, the fact that the State cannot literally perform its agreement does not excuse it from performing as much of the agreement as is possible. The majority's argument is similar to an impossibility defense to a contract action. However, even if a contract is impossible to perform, that does not void the contract if a party can partially comply with the agreement.

The conditions that rendered performance impossible do not terminate the contract *ab initio*, and vitiate what has been done and what remains to be done that is capable of execution.

The conditions may be of such an extent as to amount to a substantial abrogation of the entire contract, or they may relate to an insignificant part of the contract, but they excuse performance only to the extent to which performance is impossible, and leave what has been done valid permitting a recovery therefor, and may not excuse performance of the remaining work.

18 Williston on Contracts, § 1956 pg. 146 (3rd ed. 1987) *quoting Umatilla Fruit Co. v. Campbell*, 123 Fla. 484, 167 So. 370 (1936), *see also* Restatement (Second) of Contracts § 270 (1981).

The Court should hold that even though the State cannot perform the literal terms of the agreement, it can be held to perform as much of the agreement as is statutorily allowed. Under the evidence before the court when it granted the direct verdict Caswell was entitled to have the State make a good-faith recommendation to the court that the case be dismissed. Such a recommendation would substantially comply with the terms of the agreement.[2] The district court could then dismiss the case in the interests of justice pursuant to I.C. § 19–3504. *See also* I.C.R. 48(2).

The majority goes on to state that even if the agreement has some legal validity, it need not be enforced because Caswell did not detrimentally rely on the agreement.

It is undisputed that Caswell did partially perform the agreement by providing Beatty with a list of ten suspected drug dealers. This information must have been of some value to the IBN as it conditioned the entire agreement on Caswell providing the list. Further, there can be no doubt that Caswell would not have parted with this information if he did not believe it would help get the charges against him dismissed. Thus it is beyond dispute that Caswell provided the list in reliance on the agreement. The only question that remains is whether the act was to Caswell's detriment.

The majority's conclusion that there was no detriment to Caswell because he was not placed in danger shows an astounding lack of understanding of police procedures. Being placed in danger cannot be the touchstone of detrimental reliance here because neither side anticipated that providing the list would place Caswell in danger. The police do not want suspected criminals to know who the police informants are, hence the term "undercover informants." It has been discovered that known undercover informants are of little or no value to the police, as criminals are loath to conduct any illegal business with them. Thus, it is unlikely, if all went according to plan, that Caswell would be put in any actual danger by providing the names. To the contrary, the IBN would have done everything in its power to make certain that no one knew

---

2. If the State would have been required to present its evidence, it very well may have been shown that a recommendation for dismissal was all that was offered in the first place. Caswell, who was not represented by an attorney during the negotiations, could have misunderstood the exact terms of the offer. Many people are under the mistaken impression that the prosecutor can "drop charges" at will. We will never know what the State's version of the facts were because the district court did not require of it the presentation of any evidence.

who provided the names of "candidate" buyers.

Simply becoming an informer for the police and providing a list of "possible victims" consisting of friends and acquaintances was detrimental reliance in and of itself. Caswell made a significant sacrifice by providing the list of names to the police and thereby becoming what is known as a "squealer," "rat," "snitch," or "stool pigeon." These are labels which are not seen as compliments. Our society detests informers. We tell our children to not be "tattle-tales." Those artists who were blacklisted in the 1950's because of their refusal to "name names" when subpoenaed before the House Unamerican Activities Committee are now considered heroes. Conversely, those who became informers are viewed with pity or contempt. A person gives up a great deal when s/he becomes an informer. It is no small sacrifice. One of the most hated persons in western history was involved in the same actions as Caswell. As we all know, it is no tribute to be called a "Judas."[3]

## IV

It is a fact of life that law enforcement authorities rely upon the services of informers in order to effectively do their job. Today, however, the majority, in its haste to affirm Caswell's conviction, actually obstructs the capture of many more lawbreakers by diminishing the incentive for defendants to cooperate with the police. Since the Court will not hold the IBN and the Jerome County Prosecutor to their bargain, there is little if any reason for other defendants to cooperate with either of those parties. Defendants will now hesitate before entering into a cooperation agreement with any law enforcement agency for fear that the agreement will not be enforceable. Further, the majority's opinion may lead to mischief by the police. Some may try to strike illusory "deals" by intentionally inserting terms they do not have the authority to perform and then

refuse to perform their obligation after the defendant has performed his/her part of the bargain.

The Court this day should be requiring the State to perform, insofar as is possible, the agreements which its agents make with informers in pursuit of furthering effective law enforcement and demonstrating fair play. Caswell has presented a *prima facie* case that there was an agreement made between him and the prosecutor. He also presented evidence that he detrimentally relied upon that agreement. A directed verdict should not have been granted because the court on the evidence before it could have ordered partial performance of the agreement. The order granting the motion for directed verdict should be reversed and the cause remanded for a new hearing.

**3.** Judas Iscariot was paid thirty pieces of silver to betray Jesus. *Matthew* 27:3 (King James). Whatever else might be said about the Romans they, unlike the IBN, at least fulfilled their agreement.