817 P.2d 139

**In the Matter of Joseph L. WILLIAMS, II, Contempt Appeal.**

**STATE of Idaho, Plaintiff,**

v.

**Theodore H. DELEZENE, Defendant,**

**Joseph L. WILLIAMS, II, Appellant on Appeal,**

v.

**Honorable L. Mark RIDDOCH, Magistrate of the Seventh Judicial District, State of Idaho, Respondent on Appeal.**

No. 18820.

Supreme Court of Idaho, Idaho Falls, May 1991 Term.

Aug. 15, 1991.

Joseph L. Williams, II, pro se appellant.

Larry J. EchoHawk, Idaho Atty. Gen. and William D. Burkhalter, Deputy Atty. Gen., argued, Boise, for respondent.

McDEVITT, Justice.

The appellant was held in contempt of court for failure to appear for trial on two

separate occasions. The magistrate fined the appellant $250.00 and sentenced him to 72 hours in jail. The district court affirmed the magistrate's order.

The appellant, Joseph L. Williams, II ("Williams"), is an attorney who represented Mr. Theodore Delezene in a misdemeanor criminal case. A trial in the Delezene matter was originally scheduled for October 3, 1989. Williams contacted Magistrate Judge McClure and received a verbal continuance based on his unavailability for trial. The verbal continuance was confirmed in a written continuance signed by Magistrate McClure. Trial was then reset for November 7, 1989. Williams moved for another continuance based upon his unavailability. It is unclear whether Magistrate McClure granted this continuance telephonically. Williams filed a written motion for continuance at 4:51 p.m. on November 6, 1989, and did not appear for trial on November 7. This motion for continuance was returned after November 7 and was signed "Denied by Riddoch." Williams concluded that the paperwork had been sent to the wrong judge, so he did not inquire further about the denial. The trial was then reset for November 28, 1989.

Williams claims he filed a demand for jury trial on November 21, 1989, and Williams believed that this request would cause the November 28, 1989 trial setting to be continued. Williams then failed to appear at the November 28, 1989 trial date. However, the original demand for jury trial was not in the court file, there was no evidence in the court docket that this document had been filed and the prosecuting attorney did not receive a copy of the demand for jury trial. Williams did not have a conformed copy of this pleading to verify his assertion.

On November 29, 1989, Magistrate Riddoch issued an order to show cause why Williams and his client, Ted Delezene, should not be held in contempt for failure to appear at two trial dates. The show cause hearing was held on December 11, 1989.

At the hearing, the magistrate stated he was proceeding pursuant to I.C. § 7–603.

Williams requested that the magistrate recuse himself because he was the individual initiating the contempt proceedings and also because Williams wanted to call him as a witness, but this request was denied. After a lengthy hearing, the magistrate found Williams in contempt, fined him $250.00 and ordered him to serve 72 hours in jail, effective immediately.

The issues we confront on appeal are: (1) does an attorney's failure to be present at court when scheduled without valid excuse constitute direct or indirect contempt; (2) is the magistrate's finding of direct civil contempt supported by substantial and competent evidence; and, (3) were the appellant's constitutional rights violated?

### STANDARD OF REVIEW

Idaho Appellate Rule 11(a)(4) allows a direct appeal from an order of contempt. Thus, we review an appeal from an order of contempt the same as any other appeal. We are not in the position to weigh the evidence and then make an independent determination, we only conduct a review of the record to determine if there is substantial evidence to support the order of contempt. *Mathison v. Felton,* 90 Idaho 87, 408 P.2d 457 (1965). We will also review the sanctions imposed under the abuse of discretion standard. *Marks v. Vehlow,* 105 Idaho 560, 671 P.2d 473 (1983).

Contempt proceedings are quasi-criminal in nature. *Bandelin v. Quinlan,* 94 Idaho 858, 499 P.2d 557 (1972); *Jones v. Jones,* 91 Idaho 578, 428 P.2d 497 (1967). Although the proceedings are quasi-criminal, an *"en masse* application of criminal rules, both substantive and procedural ... is unwarranted." *State v. Palmlund,* 95 Idaho 150, 153, 504 P.2d 1199, 1202 (1972). The proceedings are *sui generis,* therefore, both civil and criminal law rules are utilized to determine the proper procedural guidelines to be employed. *Id.*

### 1. AN ATTORNEY'S FAILURE TO BE PRESENT IN COURT WHEN SCHEDULED WITHOUT VALID EXCUSE CONSTITUTES A FORM OF DIRECT CONTEMPT.

Williams challenges the finding of direct contempt. He asserts that an attor-

ney's failure to appear in court is indirect contempt, which requires heightened procedural safeguards. There are three distinct lines of authority dealing with an attorney's failure to appear in court. The first holds that the failure to appear is indirect contempt; the second holds that the failure is direct contempt; and, the third holds that the failure to appear is a hybrid form of direct contempt.

Categorizing contempt is important, as Idaho law prescribes different procedures for direct and indirect contempt. Idaho Code § 7–603 allows for direct contempt to be punished summarily, but it requires that an indirect contempt must be initiated by an affidavit. *See also,* I.C.R. 42. The absence of an attorney presents a unique situation that does not fit easily into either category. We have not passed upon this issue previously. We find that a review of the three lines of authority from other jurisdictions is instructive on determining this issue.

An example of those cases holding that an attorney's failure to appear is indirect contempt is *State v. Hatten,* 70 Wash.2d 618, 425 P.2d 7 (1967). In *Hatten,* the attorney represented the defendant in a criminal trial. On the second day of trial, the attorney failed to appear at the appropriate time. After one hour and fifteen minutes, the absent attorney finally arrived at court. The trial judge immediately placed the absent attorney under oath and questioned him about the reasons for being late. The attorney failed to proffer an adequate excuse or apology, so the trial judge ordered the attorney to appear the next day and defend against the charge of contempt. The hearing was held and the attorney again failed to provide an adequate excuse for arriving late for trial. The trial court set forth findings of fact and placed the attorney in contempt.

The *Hatten* Court stated that an attorney's failure to appear in court is not a contempt committed in the presence of the court. Although one aspect of the contempt, the failure to appear, is viewed by the court, the explanation for the absence is not known. The Washington State Supreme Court held that the alleged contemnor must be given the opportunity to be heard and to produce witnesses or other evidence to excuse the absence, therefore, summary disposition is inappropriate.

A few jurisdictions hold that an attorney's failure to appear is a direct contempt, properly punished using summary proceedings. In *Commonwealth v. Marcone,* 487 Pa. 572, 410 A.2d 759 (1980), the absent attorney missed the weekly roll call of trials. Upon his arrival at the courthouse three hours later, the trial judge asked for an explanation for the absence. Upon receiving an inadequate response, the trial judge found the absent attorney to be in direct contempt and punished him accordingly.

The Pennsylvania Supreme Court affirmed the finding of contempt. The court held that the absence of an attorney is a direct affront to the judicial system and it is proper to punish such conduct summarily. The court specifically found that summary adjudication allowed the court to dispense with the "traditional steps" used in most cases, *i.e.,* "the issuance of process, service of complaint and answer, holding of hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a traditional court trial." *Commonwealth v. Marcone,* 487 Pa. 572, 579, 410 A.2d 759, 763 (1980).

The third line of cases is best explained in the concurring opinion in *Chula v. Superior Court of Orange County,* 57 Cal.2d 199, 18 Cal.Rptr. 507, 368 P.2d 107 (1962). In concurring in the opinion that affirmed a finding of contempt, Chief Justice Gibson described the situation a "hybrid;" the contempt arises from the failure to appear by the attorney, which occurs in the presence of the court, which is claimed to be excused by matters taking place outside of the court. In this situation, Chief Justice Gibson found no reason to require an affidavit or outside testimony to substantiate the facts surrounding the alleged contempt. All that is required is an order to show cause to apprise the attorney of the

charges against him and a hearing to allow the attorney to explain the absence.

*In re Yengo*, 84 N.J. 111, 417 A.2d 533, *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1980), is an example of those jurisdictions that have adopted the hybrid approach. *Yengo* dealt with an attorney who was absent for two days during a complex trial involving multiple defendants that lasted five weeks. On the days that the attorney was absent, he sent a second attorney to represent his client, the substitute was not knowledgeable about the case. The trial judge became concerned that the second attorney was inadequately informed to represent the defendant. The trial judge then tried to ascertain the whereabouts of the absent attorney. A call to his residence revealed that Yengo had taken a short vacation to Bermuda. The trial judge sent a telegram to the attorney's residence ordering him to appear and show cause why he should not be held in contempt for failure to appear at trial.

The absent attorney appeared at the appointed time for the show cause hearing. When asked to explain his absence he stated that he went to Bermuda on behalf of another client. The trial court noted that the attorney had not informed the court prior to his leaving, although he had informed the prosecuting attorney and the other defense lawyers. The trial court found this explanation unsatisfactory and found the attorney in contempt and fined him $500.00. The New Jersey Supreme Court held that the unexplained absence of an attorney is appropriately dealt with summarily. The absence is within the presence of the court and once the attorney returns and offers an explanation, both elements of the offense are in the presence of the court. Thus, the contempt is a hybrid, but is ultimately a direct contempt committed in the presence of the court.

■ We find the hybrid form of direct contempt argument persuasive. The circumstances surrounding the absence of an attorney in court are readily apparent to the court. The court is aware that the attorney's presence is required, that the

attorney was aware that his presence was necessary and that the attorney is absent. Once the attorney has been given the opportunity to explain the absence to the court, all elements of direct contempt are present. Therefore, the attorney's absence is a direct contempt. *Von Hake v. Thomas*, 759 P.2d 1162 (Utah 1988). While we conclude that an attorney's absence is a direct contempt, this unique situation cannot be dealt with in a purely summary fashion, the contempt is a hybrid and must be dealt with accordingly. The subject attorney must be notified of the charge of contempt, the specific order of the court allegedly violated, and other important facts surrounding the alleged contempt. Proof of knowledge by the attorney of the original court order must also be shown. After receiving notice the absent attorney must be given a meaningful opportunity to explain the absence. These requirements are best met by issuing an order to show cause and conducting a hearing to allow the attorney to explain the absence. The subject attorney must be given the opportunity to be represented by counsel, to call witnesses is his or her behalf and to present evidence. *Ross v. Coleman Co.*, 114 Idaho 817, 761 P.2d 1169 (1988); *Bandelin v. Quinlan*, 94 Idaho 858, 499 P.2d 557 (1972). Any other method would not preserve the subject attorney's due process rights.

■ Although notice of the charges and the hearing are necessary, an attorney's failure to appear is best dealt with in a direct contempt manner. This allows the involved judge to preside at the show cause hearing and to remain as a judicial officer and not as a litigant. These considerations best serve the administration of justice. *Lyons v. Superior Court of Los Angeles County*, 43 Cal.2d 755, 278 P.2d 681, *cert. denied*, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955).

■ In the present case, the magistrate issued an order to show cause on November 29, 1989. The original hearing date was December 6, 1989. The hearing was continued and was eventually held on December 11, 1989. The magistrate's order

to show cause stated that the original trial was set for October 3, 1989, but was continued because of counsel unavailability and was reset for November 7, 1989; that Williams filed a late motion to continue the November 7 trial date on November 6 (which evidences that Williams was aware of the November 7 trial date); that this motion was denied and Williams and his client failed to appear at the November 7 trial; that by order of court the trial date was reset for November 28 (which order was served upon Williams); and, that Williams and his client failed to appear for trial on November 28. The order then required Williams and his client to appear and show cause why they should not be held in contempt. Thus, fulfilling all of the requirements necessary.

At the hearing, Williams was given the opportunity to explain his absence. His client was also allowed to explain his absence.[1] Williams stated that he felt the November 7 trial date had been continued and so he did not appear. Williams then called four witnesses to explain his absence on November 28. Williams attempted to prove that he had filed a demand for jury trial on November 21, which he felt would then require the November 28 trial to be reset. The court's file did not contain the demand for jury trial and Williams did not have a conformed copy of the demand, nor did Williams serve a copy of the demand on the prosecuting attorney. Williams asserted that the clerk's office either negligently lost the original demand for jury trial or that the demand was misfiled. Williams further attempted to prove that the court clerks refused to conform copies when asked. Despite these accusations, and without any evidence that Williams had filed the demand, the magistrate came to the conclusion that the demand had not been filed.

■ Finally, a basic requirement is that, while findings of fact and conclusions of law are not necessary, the order finding contempt must state the specific acts that

are considered to be contemptuous. I.C. § 7–603; I.C.R. 42(a). In his order, the magistrate found Williams in contempt for "failure to appear as counsel of record for trial on November 7th and 28th, 1989 and for last minute continuances and tardy requests for jury trial (if filed at all) in the case of *State v. Delezene....*" This is a sufficient explanation of the acts found to be contumacious.

We hold that the magistrate followed the correct procedure in adjudicating the contempt. There was no error.

## 2. THE MAGISTRATE'S FINDING OF DIRECT CIVIL CONTEMPT IS SUPPORTED BY SUBSTANTIAL AND COMPETENT EVIDENCE.

■ The appellant challenges the sufficiency of the evidence in finding him in contempt. A thorough reading of the transcript and a review of the court files offers substantial and competent evidence to support the finding of the magistrate.

At the hearing, Williams testified that he obtained a verbal continuance for the November 7 trial date from Magistrate McClure, so he knowingly did not appear for trial on that date. When the written continuance was returned to him "Denied by Riddoch," he failed to inquire further into the matter. Williams then testified that he thought that the demand for jury trial would continue the November 28 trial date, so again he failed to appear for trial. Williams then failed to produce conclusive evidence that the demand was filed. The evidence supports the finding that Williams failed to appear on two trial dates.

While we understand appellant's contention that he felt that he had valid reason not to appear, we cannot condone his conduct. Sometimes, oral continuances the day before a scheduled trial are necessary for unforseen reasons. However, the testimony of the appellant showed a habitual use of successive oral continuances and late filing of motions for continuances.

---

1. The client, Delezene stated to the court that he did not appear on the two trial dates because his attorney had told him the trial had been continued. The client was not found to be in contempt.

Nor are we sympathetic to appellant's claim that the clerk of the court lost the original demand for jury trial. Both I.R.C.P. 5(a) and I.C.R. 49 require service of all pleadings filed with the court upon all parties affected. Undoubtedly, the prosecuting attorney would be affected by the demand and Williams failed to serve a copy of the demand on the prosecuting attorney. Williams offered no excuse for failing to serve the prosecuting attorney. We cannot say that the magistrate erred in finding that appellant's conduct was contemptuous.

Appellant further contends that the magistrate erred in finding civil contempt. Williams asserts that the sanctions imposed were criminal, rather than civil in nature. When sanctions are imposed to punish the contemnor for past acts, the contempt is criminal; when sanctions are imposed for compensatory or coercive reasons, the contempt is civil in nature. *Marks v. Vehlow*, 105 Idaho 560, 671 P.2d 473 (1983). In this case, the sanctions were imposed to penalize Williams for failing to appear on two trial dates without valid excuse. It is also evident from the court's colloquy that the sanctions were also imposed to induce Williams to better manage his affairs and to not file tardy requests for continuances and requests for jury trial. Thus, the sanctions imposed had both a criminal and a civil purpose. There was no error in labeling the contempt as civil rather than criminal. Any error in nomenclature, if any, is harmless.

## 3. THE APPELLANT'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED.

Appellant has alleged that several of his constitutional rights were violated. First, Williams contends that his right to present evidence and confront witnesses was violated. Appellant takes exception to this statement made by Magistrate Riddoch:

I don't doubt that [the contention that Williams obtained a verbal continuance from Judge McClure] is what your witnesses will testify to. I don't accept that

as the truth at all. In fact I have serious doubts that is the practice of Judge McClure because on other matters not involving yourself ... and not involving this case ... I have had the opposite of that.

Williams asserts that this statement shows that the magistrate would not consider any evidence or believe any of the witnesses produced by Williams. We disagree. Williams was given the opportunity to call three witnesses on his behalf, in addition to testifying himself. Williams also introduced four instruments claiming the originals had been filed. The magistrate considered this evidence, but took the position that only conformed copies of the filed pleadings were evidence of filing. This was not erroneous. It was permissible for the magistrate to rely upon the clerk's record to determine that the original pleadings had not been filed. There is no constitutional violation.

Williams contends that he was denied the opportunity to confront his accuser, Magistrate Riddoch. This argument is without merit. In summary contempt proceedings, the necessities of the case require the judge who witnessed the conduct to preside at the hearing. *Vaughn v. Municipal Court of Los Angeles Judicial Dist.*, 252 Cal.App.2d 348, 60 Cal.Rptr. 575, *cert. denied*, 393 U.S. 856, 89 S.Ct. 125, 21 L.Ed.2d 126 (1967). Indeed, both I.C. § 7–603 and I.C.R. 42 allow, if not require, that the judge who witnessed the conduct punish such conduct. It is also important to consider that the Idaho Rules of Evidence bar a judge from serving as both judge and witness in the same proceeding. I.R.E. 605. Because the judge is to preside at the hearing and the judge cannot be called as a witness, there is no right to call the judge as a witness in summary contempt proceedings. Nor does this violate any constitutional rights. All facts within the judge's knowledge were recited in the order to show cause. There was no question that Williams had failed to appear and the only issue was whether that failure was excusable. Requiring the judge to be a witness would not have brought any additional facts to light.

■ Appellant contends that his right to adequate representation of counsel was denied. Appellant did not request counsel be appointed nor did he complain of lack of counsel at the show cause hearing. Normally, because of the failure to assert this right, we would not consider this issue. *State v. Hernandez*, 107 Idaho 947, 694 P.2d 1295 (1983); *State v. Kellogg*, 102 Idaho 628, 636 P.2d 750 (1981). However, Williams did file and obtain a continuance of the original date set for the show cause hearing. In his affidavit to obtain the continuance Williams stated that, "[i]t would be wise for counsel to be retained to represent myself in these proceedings, and time would be needed to arrange for counsel to be present...." While this brief statement is insufficient to raise the issue, in the interest of justice we will address the issue of adequate representation of counsel.

■ A defendant has the right to the effective assistance of counsel. *Stuart v. State*, 118 Idaho 932, 801 P.2d 1283 (1990). Idaho Rule of Civil Procedure 6(c)(2) requires an order to show cause be served upon the party to whom it is directed five days prior to the date set for hearing. The order to show cause was served upon Williams on November 30th. The original hearing date was set for December 6. This gave Williams five days to obtain representation. The motion for continuance was made December 4, and the hearing was continued to December 8. Later, the magistrate continued the hearing to December 11. This gave Williams another five days to obtain representation. We hold this was a sufficient amount of time to obtain representation. At the hearing, Williams failed to assert his inadequate representation claim. It is evident that Williams knew that he could be represented by an attorney. Williams failed to inform the court of his desire to be represented or of any difficulty in obtaining counsel. Any possible prejudice was occasioned by appellant's own actions. Appellant was given sufficient time to obtain counsel, but failed to do so on his own account. We hold there was no constitutional violation.

■ Williams asserts as error the magistrate's failure to recuse himself because of bias. At the beginning of the hearing, the appellant stated:

Number one, I am a little bit concerned, and I don't mean to sound disrespectful to the Court, but I am a little bit concerned since the Court has sought to bring this Order, that the Court is hearing it today. I am a little concerned that the Court has been privy to information, ex parte conferences with court personnel that I haven't been present on. In fact there has been some sort of an investigation conducted inhouse [sic], information has been obtained from the court clerk, the Judge's clerk Evie, or the Judge himself.

I would like to make a motion that the Judge consider having someone else hear this so that in fact we don't have the appearance of any impropriety if in fact the Judge has been biased by some of the one-sided conversations he may or may not have heard. I believe that would be proper since in fact the Court is bringing this motion.

In response to the allegation of bias, the magistrate reassured the appellant that he was not biased. The appellant failed to allege any facts that would show bias. Williams merely asserts that he has heard "rumors" that there was bias. Without specific allegations evidencing the bias, it was proper for the magistrate to deny the motion.

■ As to appellant's contention that the court was biased because it was the one bringing the motion, this too was properly denied. A judge is not automatically prejudiced because it is the judge that is bringing the motion to show cause. *Continental Ins. Cos. v. Bayless & Roberts*, 548 P.2d 398 (Alaska 1976); *State ex rel. Wendt v. Journey*, 492 S.W.2d 861 (Mo. App.1973). Requiring recusal by a judge because it is the judge that institutes the contempt proceedings would not serve the interests of justice. *Lyons v. Superior Court of Los Angeles County*, 43 Cal.2d 755, 278 P.2d 681, *cert. denied*, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955).

The magistrate did not err by refusing to recuse himself.

Appellant asserts that he had the right to disqualify the magistrate with or without cause pursuant to I.C.R. 25. We also find this argument to be without merit. As we stated previously, contempt proceedings are unique, criminal rules are used for guidance only, they are not mandatory. Therefore, in a proceeding for direct contempt, there is no right to disqualify the involved judge. *Gipson v. State,* 102 Nev. 61, 714 P.2d 1007 (1986); *Turkington v. Municipal Court of San Francisco,* 85 Cal.App.2d 631, 193 P.2d 795 (1948). Only in those cases where the contempt is a personal affront to the judge should the judge disqualify himself from presiding at the hearing. *State ex rel. Wendt v. Journey,* 492 S.W.2d 861 (Mo. App.1973). In this case, the conduct of the appellant was not a personal affront to the magistrate, therefore, it was unnecessary for the magistrate to recuse himself.

Appellant asserts as error the fact that the magistrate considered and "found him guilty" of other alleged instances where Williams failed to appear for court before other judges. The magistrate did consider other instances when Williams arrived late to court or failed to appear at all. Williams also complains of the magistrate's private conversations with third parties concerning other alleged absences. The magistrate admitted that he had talked to other judges about appellant's tendency to miss hearing and trial dates without valid excuse. This information was not used to support the charge of contempt, but only to determine the appropriate sanctions. A contemnor's prior history can be considered in determining the appropriate sanction. *Lyons v. Superior Court of Los Angeles County,* 43 Cal.2d 755, 278 P.2d 681, *cert. denied,* 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955). We see no error in considering the prior history of the appellant's difficulty in being in court at the appointed time.

Appellant asserts as error the fact that the order to show cause failed to notify him of the possible sanctions to be imposed if he was found in contempt. We have held that in an indirect contempt proceeding, notice of the possible sanctions (fine and/or jail term) must be given. *Ross v. Coleman,* 114 Idaho 817, 761 P.2d 1169 (1988); *Bandelin v. Quinlan,* 94 Idaho 858, 499 P.2d 557 (1972). Because proceedings for direct contempt are more summary in nature, some of the safeguards applicable to indirect contempt do not apply. *Arthur v. Superior Court of Los Angeles County,* 62 Cal.2d 404, 42 Cal.Rptr. 441, 398 P.2d 777 (1965). At the beginning of the hearing Williams stated:

I have heard some rumors that in fact there may be some bias on behalf of the Court. I have heard some rumors that in fact the Court may be considering some sort of contempt citations to embarrass myself as counsel. One of those possible remedies may be to jail counsel if the Court feels I haven't been candid with the Court. I see the bailiff is present, he may have been subjected to some of those rumors. I don't know whether he is present because the Court is considering that sanction, has discussed that sanction with the bailiff.

This statement evidences that Williams knew what sanctions were possible. After Williams made this statement, the magistrate stated that he was proceeding pursuant to I.C. § 7-603. This statement put Williams on notice that, if found in contempt, he could be sanctioned pursuant to I.C. § 7-610, which provides for a fine not to exceed $500.00 or a jail term not to exceed five days, or both. Accordingly, we hold that Williams had sufficient knowledge of the possible sanctions. There was no error by failing to include notice of the possible sanctions in the order to show cause.

We have reviewed all other assignments of error made by the appellant and find them to be without merit. We hold there was substantial evidence supporting the finding of contempt. We further hold that the magistrate did not abuse his discretion in imposing sanctions of $250.00 and 72

hours in jail. The judgment of contempt is affirmed.

Costs to respondent.

BAKES, C.J., and JOHNSON and BOYLE, JJ., concur.

BISTLINE, Justice, dissenting.

The purpose of this dissent is that interested readers will be sufficiently informed that the contempt conviction under review is not as cut and dried as the majority opinion portrays it to be. For support of this proposition, included below are the affidavits of Laurie Christensen, Juli Beyer, Josie Goerger, and Don Neddo; all of whom have sworn to a recitation of facts and circumstances which strongly suggests the alleged contempt did not merit the infliction of seventy-two hours in jail and a $250 fine as the penalty. Taking the appeal record as a whole, a careful review of the evidence also suggests there may not be sufficient evidence to affirm the lower court's disposition of the matter, thus making the doing so inappropriate in light of existing case precedent:

COMES NOW the Affiant, Laurie Christensen, being first duly sworn upon oath, deposes and says:

1. That I am a paralegal for the law firm of Joseph L. Williams II.

2. That on November 6, 1989, I was instructed by Mr. Williams to contact the court clerk and see if the judge would grant a continuance in the above referenced matter, which was scheduled for trial on November 7, 1989.

3. That at 3:48 p.m. on this date I called Klea Metcalf and asked her to see if Judge McClure would be willing to continue the trial set for tomorrow or would we need [to] send over a **REQUEST FOR A JURY TRIAL.**

4. Klea asked the Judge and stated to me, "The Judge said he can have the continuance for two weeks only, then he can ask for his damn jury trial."

5. I then called the client and told him that court was continued.

6. That on November 8, 1989, I received our continuance back from the court denied by Judge Riddoch.

Affidavit of Laurie Christensen, subscribed and affirmed November 29, 1989.

COMES NOW the Affiant, Juli Beyer, being first duly sworn upon oath, deposes and says:

1. That I am a paralegal for the law firm of Joseph L. Williams II.

2. That on November 21, 1989, I was instructed by Mr. Williams to prepare a REQUEST FOR A JURY TRIAL on the above referenced matter. I prepared it and put the original in the file and placed the file on Mr. William's desk for signature.

Affidavit of Juli Beyer, subscribed and affirmed November 29, 1989.

COMES NOW the Affiant, Josie Goerger, being first duly sworn upon oath, deposes and says:

1. That I am the copy and file clerk for the law firm of Joseph L. Williams II.

2. That on November 21, 1989, I made three copies of the **REQUEST FOR A JURY TRIAL** on the above referenced matter. I remember putting an original and one copy for the court and one copy for the Prosecutor in the file to go to court with Don Neddo, our runner. I put the other copy in our file with our stamp stating the date the document was copied and who copied it, which is standard procedure in our office for any paperwork being mailed or filed with the courts.

Affidavit of Josie Goerger, subscribed and affirmed November 29, 1989.

COMES NOW the Affiant, Don Neddo, being first duly sworn upon oath, deposes and says:

1. That I am the runner for the law firm of Joseph L. Williams II.

2. That on November 21, 1989, I made my usual court run and I remember hand delivering to the Bonneville County Courthouse a **REQUEST FOR A JURY TRIAL** on the above referenced matter. (I specifically remember this because I know the above named Defendant's father.)

**484**

3. I did not receive a conformed copy of this document because I was instructed by previous runners that the clerks rarely give conformed copies when asked for them in criminal matters.

4. That on November 28, 1989, I filed several documents on Thomas Hollingsworth and requested conformed copies of these documents. I was told by Etta Baker that I did not have enough copies of the documents to receive conformed copies, and I gave her an original and one copy.

5. I have now been instructed to write down each time I am refused a conformed copy by a clerk.

Affidavit of Don Neddo, subscribed and affirmed November 29, 1989.

## PART I

Judge Riddoch, presiding magistrate in this case, was not in the least impressed with the foregoing statements of the four witnesses who were sworn to tell the truth in a court of law. Having assumed the position of trier of fact in the very case over which he presided, Judge Riddoch was obliged to accept their testimony unless he was prepared to make a finding that each of them was not worthy of belief—not credible witnesses.

Such is the thrust of the time honored *Pierstorff* rule, from *Pierstorff v. Gray's Auto Body Shop:*

The rule applicable to all witnesses, whether parties or interested in the event of an action, is that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial.

58 Idaho 438, 447, 74 P.2d 171, 175 (1937).

Judge Riddoch did not make a finding that the testimony of any of those witnesses was inherently improbable, or rendered so by facts and circumstances at the trial over which he presided. As part and parcel of the *Pierstorff* rule, the Idaho Supreme Court went on to add: "... neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability." *Pierstorff*, 58 Idaho at 447–48, 74 P.2d at 175.

The *Pierstorff* rule is *not* ancient history, but to the contrary is thoroughly imbedded in Idaho case law precedent. *Sprague v. Caldwell Transp., Inc.*, 116 Idaho 720, 722, 779 P.2d 395, 397 (1989); *Systems Assoc. v. Motorola Co. & Elec.*, 116 Idaho 615, 621, 778 P.2d 737, 743 (1989); *Dinneen v. Finch*, 100 Idaho 620, 627, 603 P.2d 575, 582 (1979) (Bakes, C.J., dissenting); *Airstream, Inc. v. C.I.T. Financial Services [Airstream II]*, 115 Idaho 569, 570, 768 P.2d 1302, 1303 (1988); *Airstream, Inc. v. C.I.T. Financial Services [Airstream I]*, 111 Idaho 307, 310, 723 P.2d 851, 854 (1986).

## PART II

Another equally worrisome facet of the proceedings below is whether there was compliance with procedural due process.

Judge Riddoch took it upon himself, as the Court, to personally initiate the contempt process. His order was that Mr. Williams and his client "appear on Wednesday, December 6, 1989, at 3:30 p.m., and show cause why they should not be held in contempt of court for failure to appear for trial on two separate dates," all of which is more fully set out in the forepart of the opinion which Justice McDevitt has written. Justice McDevitt has noted—without comment—that "Williams requested that the magistrate (Judge Riddoch) recuse himself because he was the individual initiating the contempt proceedings...." That is an accurate statement of the circumstances other than that it was not an "individual" who initiated the proceedings, but rather Judge Riddoch, a magistrate, who had done so. As intimated above, the judge would in turn be the initiator, and more aptly, the instigator, of the charges against Mr. Williams. Additionally, Judge Riddoch also passed on the validity of objections which would be, and in fact were, raised during the proceeding; excluded evidence he declared to be hearsay; and assumed the

function of trier of fact who would decide whether Mr. Williams was guilty or innocent of the unlaid charge of being in contempt of court, which in turn resulted in Judge Riddoch imposing sentence on the very person he himself had charged with contempt.

All of which is the actual factual situation which Mr. Williams was in, and which would also include the all-purpose judge interrogating Mr. Williams and his witnesses—which the reporter/recorder and/or the transcriber accurately designated as cross-examination by the court. In addition, also in the courtroom as an attorney was a Mr. Mason, who was not identified until he participated by making objections when Mr. Williams was interrogating witnesses.

Shortly after Mr. Mason voiced his first objection to a question of a witness propounded by Mr. Williams, Mr. Williams sought to ascertain Mr. Mason's status when Mr. Williams concluded with the witness Sandy Grover. The following occurred:

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Mason, do you have any questions?

MR. MASON: I don't believe so.

MR. WILLIAMS: Your Honor, is Mr. Mason here officially representing anyone?

THE COURT: He represents the clerks, he represents the county.

MR. WILLIAMS: Is he officially—well, he has raised the attorney-client privilege. I was just curious exactly in what capacity he was going to be here today.

Is he here as an observer also?

THE COURT: He is here to represent the county.

MR. WILLIAMS: Oh.

THE COURT: And its employees.

MR. WILLIAMS: I didn't know they were on trial, Your Honor, that is the reason I asked.

MR. MASON: Your Honor, perhaps I can respond to that? Any time we have a county official subpoenaed for any hearing we like to attend and advise them if they feel a need. That is my purpose for being here today.

THE COURT: Now, there wasn't a subpoena for today. Was there a subpoena previously?

MR. MASON: There had been subpoenas issued that I was aware of and we came. If any county officials are called upon to testify and want to avail themselves of our counsel we have a right to come.

THE COURT: Well, Miss Grover, you testified to the last couple of questions of Mr. Williams that apparently you have some bias or dislike toward Mr. Williams and what is the reason for that?

THE WITNESS: He has, as I would term it, harassed several of the court clerks on numerous occasions and has made their job performance suffer because of this continual harassment of the clerks.

THE COURT: You don't have any personal knowledge of anything like that; have you witnessed or had anything toward you?

THE WITNESS: I have witnessed it on several occasions.

THE COURT: When, if you can?

THE COURT [sic, THE WITNESS]: Well, on—just recently when he came to the clerk's office and was inquiring of E.J. Baker, one of my deputies, regarding his document that was filed, he was very argumentative with her and in fact questioned her intelligence and was very disrespectful to her. At that point I did have a confrontation with Mr. Williams and told him I didn't appreciate that kind of conduct with one of the deputies in my office.

There have been other occasions where I have been aware that he has been extremely rude with the clerks of the court.

Tr., 48–50.

Proceedings in the trial court concluded with the taking of the testimony of the four witnesses mentioned in Justice McDevitt's opinion. Immediately prior thereto, the trial court ruled that Mr.

Williams's inability to produce a conformed copy was prima facie evidence that he had not complied as a matter of law. Because that ruling set the tenor of the contempt hearing, it is better that the pertinent portions of the reporter's transcript be displayed, keeping in mind that the prosecuting attorney was present, but the court, not the prosecutor, was building the case against Mr. Williams:

> THE COURT: That depends on whether you asked for it and are entitled to one, that depends on a lot of things, but as far as evidence you have evidence. *I have admitted as evidence, as if testified to, your representations, so there is no question about that.*[2]
>
> Do you wish to call any other witnesses besides those you have outlined?
>
> MR. WILLIAMS: Well, I would like to call Sandy, Your Honor, to do some evidence here on the Theodore Delezene file and find out exactly whether or not this pleading could have been lost, why it wasn't stamped in, whether there is a policy of stamping them in. I think we need to put something on.
>
> THE COURT: Very well. We will call Sandy Grover, but I want to caution you that this is a representative of the Clerk of the Court. I am not making any assumptions of some wrong doing on the part of the clerk or some lack in any way, that will have to come out in questioning.
>
> MR. WILLIAMS: I realize that, Your Honor.
>
> THE COURT: Sandy Grover.

....

> BY THE COURT:
> Q. Would you state your name, please?
> A. Sandy Grover.
> Q. And your position?
> A. Court clerk supervisor.
> Q. How long have you been that?
> A. Since May of this year.
> Q. How long have you been in the position of—the relative position that you are in?
> A. Twelve years.
> Q. How long have you been a clerk?
> A. Twelve years.
> Q. Could you explain for the record what the—the best of your recollection what the method is upon receipt for alleged documents for continuance or Request for Jury Trial in a criminal case?

Tr., 22–24 (emphasis added). Clearly, indeed, the court itself declared as evidence admitted Mr. Williams' statement of representations which are detailed in the first footnote of this dissenting opinion. At this point in the proceedings, Mr. Williams stated his desire to question Sandy Grover in order to find out why the request for a jury trial was not "stamped in," whether there was a policy of stamping documents in as they were filed. The trial court acquiesced in the request, but cautioned Mr. Williams that Sandy Grover is a representative of the Clerk of the Court, and that the court would make no assumptions of some wrong doing on her part. The court then called

---

2. Earlier, at Tr. 11–12, the trial court asked Mr. Williams "to outline for me by way of representation what your witnesses are going to testify to." Mr. Williams stated that Don Neddo, the messenger for the office could personally testify to receiving the involved documents from office staff and having taken them to the courthouse, specifying particularly the request for a jury trial, and that Laurie Christensen, office supervisor, could testify that she conversed with Klea Metcalf, the trial judge's clerk, as she had done in the past, and that a memo in the file would show that the conversation took place resulting in a continuance of the first trial date setting. Mr. Williams additionally stated that Christensen would testify that this motion for a second continuance came back stamped: "Denied by Riddoch" from which Christensen deduced and assumed that the motion intended for Judge McClure had gone to the wrong judge, whereas there would have been no problem had it gone to Judge McClure. Williams specified that Josie Goerger's testimony would be that she in fact copied the request for a jury trial and handed it to Don Neddo, who went to the courthouse, and also would testify as to her experience of coming to the courthouse with pleadings and the difficulty at times of getting conformed copies stamped as such. Juli Beyer, according to Mr. Williams, would testify that she prepared a request for jury trial on November 21, 1989, as requested. Mr. Williams also stated that Sandy Grover, a deputy court clerk, was there to testify on pleading filing and conforming procedures, but, as matters developed, Sandy Grover was called as a witness.

Sandy Grover to the stand, and the reporter's transcript reads, *"SANDY GROVER,* called as witness by the defendant for cross examination under the rule, after being duly sworn, took the stand and testified...." Tr., 24. The trial judge, at this point, did not let Mr. Williams have the witness, but abruptly proceeded to interrogate her as to standard procedure of the clerk's office on receiving documents which were either a request for a continuance or a request for a jury trial. Grover appears to have indeed been well-prepared for the question and without any pause delivered those standards flawlessly:

A. When a Request for Jury Trial is filed the standard procedure would be to clock in the original Request. If the attorney provides copies and asks for those to be conformed with the docket stamp we do, we put the docket stamp on them, conform copies for them and return them to the attorney at that time.

If there is a Motion for Continuance, and that is all it is, strictly a Motion for Continuance, that is clocked in as well. If there are copies attached or brought with the attorney, those copies are clocked in and returned to him.

If it is a proposed order for the Judge's signature, those are not docketed in until they are signed by the Court because they are not in effect until the Court has approved them.

That is our standard office procedure. Tr., 24–25. The court *then* turned Sandy Grover over to Mr. Williams for examination. Two of the questions which he asked her, and her answers, serve to demonstrate the atmosphere of the hearing:

Q. [By Mr. Williams] What were you doing here in the courtroom today.

A. I am an observer.

Q. Is everyone else here an observer?

A. You'd have to ask them.

Tr., 43.

As the proceeding was approaching its finale, Mr. Williams, responsive to the court's inquiry as to whether there were any other witnesses, stated that he would like to call Mr. Mason to the witness stand. Asked by the court, "For what purpose,"

Mr. Williams explained his purpose. The court's reaction to the explanation was that the court once again took the questioning away from Mr. Williams by saying, "Let me just inquire," and the court did just that, and then expressed its satisfaction with the answers which it had elicited.

Mr. Williams then was given a turn at questioning Mr. Mason, and in midstream of doing so, Mr. Mason, the witness on the stand, interrupted a question being propounded in order to suggest that up to that point in the proceeding the testimony elicited from him was not given under oath, and *if he was going to be further examined as a witness he preferred to be sworn, with which Mr. Williams agreed and so requested. The court, however, thought differently than Mr. Mason and Mr. Williams, and ruled: "I just don't see the need for it. We have representations as an officer of the court and that satisfies me."* Tr., 100 (emphasis added). Mr. Williams then suggested to the court a need to ascertain who, if anyone, showed up at the first scheduled hearing in the Delezene criminal case. The trial court's response to that was to once again take over and question Mr. Delezene, reminding *him,* that he was still under oath. "Did you appear on the 7th?" following which, with Mr. Mason still on the stand but not participating, ensued this line of questions and answers:

MR. DELEZENE: No, I was told I did not—

THE COURT: I know Mr. Williams didn't.

MR. WILLIAMS: Did the Prosecutor?

THE COURT: Mr. Simpson was here.

MR. WILLIAMS: On both occasions?

THE COURT: On both occasions. And you will note—you referenced a courtesy phone call, you will note that nothing was done until the second non-appearance two weeks later. This was not a casual matter on the part of the Court.

MR. WILLIAMS: We can appreciate we would have preferred to have called on the first one so the second one wouldn't have occurred if there was a

hole in our procedure or anyone's procedure.

I have looked back, Your Honor—I believe if you will refer to the court minutes—I can't tell, the attorney isn't named on one of those hearings, I can't tell—

**THE COURT:** I can state for the record he was here.

**MR. WILLIAMS:** My record shows that Judge Smith heard the first hearing and you are stating from your court minutes—

**THE COURT:** I am stating from my knowledge, that I and Mr. Simpson were here.

Tr., 101–02. Significantly, the trial judge was not under oath as was true of Mr. Mason, who wanted to be, and the trial judge supplied three unsworn statements which established to the court's satisfaction that Mr. Williams was not present for the hearing scheduled on the 7th, but that he, the trial judge, also was present and that Mr. Simpson, the prosecutor, was there. The proceeding then terminated with Mr. Williams declaring that his office had never intentionally missed a court hearing, following which the court explained its position, rendered its verdict, and imposed sentence:

**THE COURT:** Very well. You have indicated, Mr. Williams, and your witnesses have indicated through your questions and their answers, that you have numerous appearances at any time and that you assume that a case will not go to trial on the date that it is scheduled. I find that in itself contemptuous and terrible, absolutely terrible and incorrect practice and as a matter of fact, Mr. Williams, that is one of the reasons you are here before this Court at this time.

It is obvious that you take too many cases knowing that you cannot go to court on the date scheduled. That is a gross violation of ethics.

**MR. WILLIAMS:** There is no testimony—

**THE COURT:** I am doing the talking, this is now a ruling.

Now, when you take a case, Mr. Williams, if you take any in this court again, you'd better be prepared to come to trial without three or four continuances or a day before the trial, oral or written request for continuance, you better not file a last-minute Request for Jury Trial.

When I called to verify with Judge Armstrong, your excuse for not coming last Wednesday, I will tell you what he told me, a last minute Request for a Jury Trial was the reason he was—and for which he was denying because it was tardy—

**MR. WILLIAMS:** He did approve, Your Honor.

**THE COURT:** Yes. Well, at any rate he was not happy.

**MR. WILLIAMS:** Well, this is part of the conversation I was concerned about and why I wanted to put the Judge on if he had some other input here that—

**THE COURT:** You are in his past.

**MR. WILLIAMS:** Thank you, Your Honor.

**THE COURT:** Now, the rules of law in court, in any court in this state, are is that—you can not rely on an oral continuance, you have got to have a written continuance. In the first place a filing at 10 minutes to five the night before just doesn't cut it. And it is that slack practice of law that has lead to this hearing, as particularized in the case of State versus Delezene, and your failure to appear on two occasions.

I find you in contempt of court, I sentence you to a $250 fine and 72 hours in jail effective immediately.

Bailiff, you will escort him to the jail, the hearing is concluded.

**MR. WILLIAMS:** Your Honor, we have a—I would move to stay execution of judgment.

**THE COURT:** Denied.

**MR. WILLIAMS:** Your Honor, we have court cases scheduled tomorrow and this is going to impact on—

**THE COURT:** That is your problem.

**MR. WILLIAMS:** Well, is Your Honor placing us in a position—

**THE COURT:** I have ruled, take him to jail.

Tr., 103–05. The record does not contain any written memorandum, order, or judgment providing findings of fact and conclusions of law. Compare to *State v. Hatten,* 70 Wash.2d 618, 425 P.2d 7, 8 (1967).

## PART III

Undoubtedly, the most instructive opinion issued by this Court in the area of contempt of court cases, and bearing the strongest similarity to the factual circumstances in the instant case, is *Bandelin v. Quinlan,* 94 Idaho 858, 499 P.2d 557 (1972). *Bandelin,* along with two other cases,[3] was relied on by the district court, the Hon. Ted V. Wood. Unmentioned in Justice McDevitt's opinion was that the decision of Judge Riddoch was first appealed to Judge Wood. With the available alternative of setting the case for hearing *de novo,* Judge Wood opted to make an appellate review of the proceedings in the trial court. With what to my mind is one of the most unsatisfactory appellate records to come before this Court, being a jumble of two cases, the *Delezene* criminal case and the *Williams* contempt case, Judge Wood pierced through the same and has favored this Court with an easily followed narration of the background which resulted in the unfortunate conflict between court and counsel:

### *FACTUAL BACKGROUND*

On October 3, 1989, attorney Joseph L. Williams (hereafter 'Mr. Williams') was scheduled to represent Mr. Theodore H. Delezene in a misdemeanor criminal trial scheduled at 10:30 a.m. before Judge McClure. Mr. Williams filed his notice of appearance and requests for discovery on September 6, 1989, and moved to continue the trial on grounds of counsel unavailability. Mr. Williams' continuance was granted on October 2, 1989. The trial was reset for November 7, 1989, at 2:00 p.m. before Judge Riddoch.

On October 6, 1989, at 3:48 p.m., Mr. Williams' secretary, Laurie Christensen, mistakenly contacted Klea Metcalf, Judge McClure's clerk, rather than Judge Riddoch, and [verbally] requested the second continuance. The conversation between Ms. Christensen and Ms. Metcalf led Mr. Williams to believe his motion for continuance had been granted. An hour later, at 4:51 p.m., Mr. Williams filed his second motion for continuance with the court.

Upon receiving Mr. Williams' written motion Judge Riddoch denied the same as being untimely and improper. Consequently, believing his motion had been granted, neither Mr. Williams nor his client appeared in court on November 7, 1989, for trial. Pursuant to a court order dated November 17, 1989, the trial was reset for November 28, 1989.

Mr. Williams alleges that on November 21, 1989, he filed with the court a request for jury trial. Concluding that such request should have resulted in voiding the November 28, 1989, court trial date and establishing a new one, again, neither Mr. Williams nor his client appeared for trial on November 28, 1989. A show cause order and notice of hearing was sent to Mr. Williams and his client asking why they should not be held in contempt for missing the November 7th and 28th trial dates.

The show cause hearing was held and Mr. Williams was found guilty of contempt and sentenced to seventy-two (72) hours in jail and a fine of $250.00. Mr. Williams was escorted to the Bonneville County jail. Mr. Williams now appeals the order of contempt.

R., 9–10.

In addressing the inquiry of the distinction between direct and indirect contempts, as noted above, Judge Wood first mentioned *Bandelin v. Quinlan,* and obviously was aware of its intent and the contents of the other two cases. Strangely, however, Judge Wood did not appreciate that there

3. The two others are *State v. Palmlund,* 95 Idaho 150, 504 P.2d 1199 (1972), and *Jones v. Jones,* 91 Idaho 578, 428 P.2d 497 (1967).

was more to *Bandelin* than the distinction between "direct contempt" and "indirect contempt." Likewise, Justice McDevitt in his opinion sees no more in *Bandelin* than that "contempt proceedings are quasi-criminal in nature ... are *sui generis*, therefore, both civil and criminal rules are utilized to determine *the proper procedural guidelines to be followed.*" 120 Idaho at 476, 817 P.2d at 142. What neither Judge Wood nor Justice McDevitt learned from *Bandelin*, and which is extremely important concerning contempt proceedings, is that no matter what classification is used, direct or indirect, or criminal, civil, or quasi-criminal, those classifications are merely niceties.

It is readily brought home to the reader of *Bandelin* that it was a district judge, the Hon. James Towles, who saw problems with a guardianship estate of which Mr. Bandelin was the court appointed guardian. Such occurred when Judge Towles was presiding at a hearing being held on objections which had been raised. The action taken by Judge Towles was to order the prosecuting attorney of the county to initiate contempt proceedings under the provisions of I.C. § 7–601(3), (9). The prosecutor did so. Judge Towles considered that his direction for initiation of proceedings would be the full extent of his involvement. Judge Towles disqualified himself from presiding at the hearing in the contempt proceedings.... 94 Idaho at 860, 499 P.2d at 559. Clearly, Judge Towles recognized that it would be questionable, or at the least, an impropriety or appearance thereof for him to preside at a quasi-criminal contempt proceeding which he had initiated on his own volition. It is not understood how it is that Judge Riddoch did not act with the same acumen and judicial restraint. Had the procedure utilized by Judge Towles in the *Bandelin* case been adopted by Judge Riddoch, it is unlikely that the services of Judge Wood and five members of the Supreme Court would have been required.

Now, turning back to the instant case, in order to uphold Judge Riddoch's conviction of attorney Williams, it becomes necessary for the majority to ignore the fact that the judge was the initiator of charges, the trier

of fact, and that there is every reason to believe that an air of hostility existed between counsel and Judge Riddoch's court, which is said full well knowing that when Mr. Williams so asserted, the trial court's response was an immediate protestation to the contrary.

Judge Wood, following his thorough examination of the written record, approached the same concern as I have entertained, stating that "if there is evidence that a judge cannot set aside prior ill will against an attorney, he should be disqualified from presiding in a case of contempt against that attorney." R., 12. The better course to have followed was the procedure established by Judge Towles twenty years ago in *Bandelin*. When Judge Towles directed the county attorney to initiate charges against Mr. Bandelin, there was no thought by anyone that there was any ill will between the two. It was simply that Judge Towles realized the system would be the better served where a judge directing that a charge be filed would thereafter preclude himself from presiding over the hearing, all of which is seemingly given no consideration in today's majority opinion.

## PART IV

The first case cited to and relied upon in Justice McDevitt's opinion, *State v. Hatten*, 70 Wash.2d 618, 425 P.2d 7 (1967), cuts strongly in favor of not upholding the conviction by Judge Riddoch, and at the same time constitutes a strong endorsement of the procedures which Judge Towles adopted. Insofar as Justice McDevitt relies upon *Hatten* for the proposition that an "alleged contemnor must be given the opportunity to be heard and to produce witnesses or other evidence to excuse the absence" [or whatever else may be the basis of the charge], his opinion is sound. Happening to know that the father of Judge Towles practiced in Spokane, Washington, it is not illogical to surmise that Judge Towles had some knowledge of the Washington procedure. Just as did Judge Towles, the Washington Superior Court in *Hatten* "directed the assistant prosecuting attorney to prepare an affidavit, as pre-

scribed [by statute], and this was served on the appellant at the end of the day." 425 P.2d at 8.

A difference between the two sets of circumstances is that Judge Wright, of the Washington court, apparently experienced no compunction in presiding at the trial of the attorney whom he had accused. All things considered, other than for Judge Wright not preparing the affidavit of charges, that case is entitled to little consideration. Moreover, according to the reported opinion, Mr. Hatten's conduct was deliberate, whereas Mr. Williams' conduct was not. Rather, Mr. Williams was found guilty of missing two court appointments because of a heavy case load.

Another fact of *Hatten* which is impressive and speaks well of the Washington Supreme Court is that per a legislative statute, contempt cannot be punished by a fine of more than one hundred dollars, and no jail servitude unless it is made to "appear that the right or remedy of a party to an action, suit or proceeding was defeated or prejudiced thereby." *Hatten*, 425 P.2d at 9. The understanding of that language suggests that contempt proceedings are to be primarily used against attorneys who have actually hurt or jeopardized their clients, and not necessarily for other purposes. Justice McDevitt is entitled to accolades for pointing to *Hatten's* holding that a failure to appear in court is not a direct contempt, having not been committed in the presence of the court.

Justice McDevitt has cited to *Chula v. Superior Court*, 57 Cal.2d 199, 18 Cal. Rptr. 507, 368 P.2d 107 (1962), from California, which was decided five years earlier than *Hatten*, and finds support in Chief Justice Gibson's "hybrid" theory of contempt. However, for my part, one does not read reported cases from the Supreme Court of California without ascertaining the stance taken by Justice Traynor, concededly the most outstanding jurist which the western United States has produced.[4] Justice Traynor wrote for himself and Justices Peters and Dooling. A true Traynor

classic, his opinion sets out with eloquence what the law has been, and what it is and should be. All of which, to my perception, is well in accord with what has been case law precedent in Idaho up until this present occasion.

**Traynor, Justice.**

I dissent.

On the authority of *Lyons v. Superior Court*, 43 Cal.2d 755, 59, 278 P.2d 681, the majority hold that 'The failure of an attorney, without valid excuse, to be present in court at the announced time for the sentencing of a client whom he is representing constitutes a contempt committed in the immediate view and presence of the court *and hence a direct contempt which the court is empowered to punish summarily under section 1211 of the Code of Civil Procedure.'* Thus, as in the *Lyons* case, the majority would condone a summary procedure that does not contemplate either notice or hearing. The courts of other jurisdictions that have considered this problem have held uniformly that such a contempt may be adjudicated only after adequate notice and hearing. (*Klein v. United States*, 80 U.S.App.D.C. 106, 151 F.2d 286, 288; *Lee v. Bauer*, 72 So.2d 792, 793 [Fla.Sup.Ct.]; *In re Clark*, 208 Mo. 121, 146, 149, 106 S.W. 990, 15 L.R.A., N.S., 389; *Weiland v. Ind. Com. of Ohio*, 166 Ohio St. 62, 66, 139 N.E.2d 36; *Ex Parte Hill*, 122 Tex. 80, 82, 52 S.W.2d 367; *State v. Winthrop*, 148 Wash. 526, 531–532, 269 P. 793, 59 A.L.R. 1265.) The *Lyons* case has stimulated widespread criticism. (39 Minn. L.Rev. 895; 7 Hastings L.J. 312; 5 Duke L.J. 155; 9 Vanderbilt L.Rev. 93.) Its holding appears to be unique.

The classification of contempts as direct and indirect is merely a semantic device for differentiating contempts that can be adjudicated summarily from those that can be adjudicated only after adequate notice and hearing. When a contempt occurs within the 'immediate view and presence of the court' the judge is

---

4. But first, one notes in passing through 18 Cal.Rptr. 507, 368 P.2d 107, that the court's opinion was not authored by Justice Gibson, but rather he wrote a concurring opinion.

fully informed of all facts necessary to adjudicate the guilt or innocence of the alleged contemner. When, however, the court is not so informed of such facts, notice and hearing are necessary to get them. (*Bulcke v. Superior Court*, 14 Cal.2d 510, 515, 94 P.2d 1006; *In re Cunha*, 123 Cal.App. 625, 633, 11 P.2d 902, 18 P.2d 979; *Lapique v. Superior Court*, 68 Cal.App. 407, 412, 413, 229 P. 1010; see Dangel, Contempt, § 14.) Indeed, due process of law requires notice and hearing in such a case. (*In re Oliver*, 333 U.S. 257, 273–278, 68 S.Ct. 499 [507–10], 92 L.Ed. 682; *Cooke v. United States*, 267 U.S. 517, 535–537, 45 S.Ct. 390, [394–95], 69 L.Ed. 767; *Bulcke v. Superior Court*, supra, 14 Cal.2d pp. 514–515, 94 P.2d p. 1006; accord: *Clark v. United States*, 8 Cir., 61 F.2d 695, 699, aff'd 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993; *In re Collins*, 329 Mich. 192, 196, 45 N.W.2d 31; see also *Carson v. Ennis*, 146 Ga. 726, 728, 92 S.E. 221, L.R.A.1917E, 650; *People v. Rosenthal*, 370 Ill. 244, 248–249, 18 N.E.2d 450, 125 A.L.R. 1271; *Cushman Co. et al. v. Mackesy et al.*, 135 Me. 490, 494, 200 A. 505, 118 A.L.R. 148; *In re Clark*, supra; *State ex rel. Beck v. Lush*, 168 Neb. 367, 370, 95 N.W.2d 695, 72 A.L.R.2d 426; *Ex Parte Mylius*, 61 W.Va. 405, 407, 56 S.E. 602, 10 L.R.A.,N.S., 1098.)

In stating that 'The failure of an attorney, *without valid excuse*, to be present * * * constitutes * * * a direct contempt' (italics added), the majority opinion itself implicitly concedes that petitioner's contempt, if any, cannot be subject to summary punishment. The absence of a valid excuse is an indispensable element of the contempt. The trial judge could not discover the nature of the excuse or determine its validity without a hearing.

In the Bulcke case, supra, this court held: 'The power of a court to punish [summarily] for a direct contempt is based upon the judge's knowledge of the commission of the act by the contemnor. A judge usually cannot say with any certainty that a letter or telegram received by him purporting to be signed by a certain person was either written or sent by that person; hence such an act, if contumacious, should be classified as an indirect contempt.' Similarly, a judge usually cannot say with any certainty that an attorney's absence is 'without valid excuse.' Hence, such absence, if contumacious, should be punished only after notice and hearing.

The trial judges both in this case and in the Lyons case recognized that they did not have the information necessary to decide the guilt or innocence of the alleged contemners, and so held hearings in which the excuses were presented and judged as to their sufficiency. In the present case the hearing followed formal notice in the form of an order to show cause. In the Lyons case there was no such formal notice. The judge orally ordered the attorney to show cause why he should not be held in contempt and decided immediately upon the validity of the excuse.

Section 1211 and section 1217 of the Code of Civil Procedure establish two procedures for the adjudication of contempts. The first is summary, and may be invoked when the judge has in his possession all facts necessary for the adjudication of guilt or innocence. The second applies when the judge does not have such facts, and requires that 'an affidavit * * * be presented to the court or judge of the facts constituting the contempt, or a statement of the facts by the referees or arbitrators, or other judicial officers.' The accused is notified of the charge against him, and the affidavit or statement of facts, like a complaint, indictment, or information, frames the issues to be adjudicated at the hearing required by section 1217.

Although the Legislature may not be free to limit the inherent power of constitutional courts to punish contempts by determining that certain acts shall not constitute contempt, it clearly may 'provide for the procedure by which such contempt shall be tried and punished * * * *.' (*Bridges v. Superior Court*, 14 Cal.2d 464, 480, 94 P.2d 983, 991.)

Denial of this power 'would be tantamount to a denial of legislative power to regulate the practice and procedure by which our courts are governed, a power which, without constitutional authority, is universally recognized in all states where the code system of pleading and practice prevails.' (*In re Garner,* 179 Cal. 409, 412, 177 P. 162, 164.) The Legislature 'may provide rules of procedure which, if adequate for the purpose designed, must be deemed operative in controlling the action of the court.' (*Ibid.* p. 413, 177 P. at p. 164.)

Thus, any departure from the procedures set forth in the Code of Civil Procedure must be justified by a demonstration that they are inadequate, that they provide either too little or too much protection to those accused of contempt. There is no suggestion that the statutory procedures are not sufficiently strict. There is no suggestion that the hearing required by section 1217 is less than that necessary to satisfy due process of law. Apparently any disagreement with the statutory procedures is based upon the view that the notice requirements of section 1211 are too strict. But this requirement, too, is minimum. The order to show cause filed by the judge in this case, for example, is a sufficient statement by a judicial officer to institute proceedings under section 1211.

That order provides: 'Please take notice that you, George H. Chula, are hereby directed and ordered to appear before this Court in Department 5 thereof at 9:00 A.M., April 14, 1961, then and there to show cause why you should not be held in contempt of this Court for willful failure to obey a lawful order of this Court made in this case March 17, 1961, to wit: To appear at 9:15 a.m. before this Court, Friday, March 31, 1961.' By alleging that petitioner's failure to appear was 'willful,' the order meets the requirement that a statement of facts under section 1211 charge knowledge of the order allegedly disobeyed (see *Phillips v. Superior Court,* 22 Cal.2d 256, 258, 137 P.2d 838) and ability to comply. (See *Mery v. Superior Court,* 9 Cal.2d

379, 380, 70 P.2d 932.) Petitioner's failure was not willful if he did not know of the order or if he was unable to appear through no fault of his own. The allegedly contemptuous act—the failure to appear as ordered—is specified in the order. The order to show cause thus meets the requirements for initiation of indirect contempt proceedings under section 1211 by framing the issues to be adjudicated at the subsequent hearing. (See *Commercial Bank of Spanish America v. Superior Court,* 192 Cal. 395, 396, 220 P. 422; *Berger v. Superior Court,* 175 Cal. 719, 720–721, 167 P. 143, 15 A.L.R. 373; *Strain v. Superior Court,* 168 Cal. 216, 220, 222, 142 P. 62; *Frowley v. Superior Court,* 158 Cal. 220, 222, 110 P. 817; *Otis v. Superior Court,* 148 Cal. 129, 130–131, 82 P. 853; *Hutton v. Superior Court,* 147 Cal. 156, 159, 81 P. 409; *Rogers v. Superior Court,* 145 Cal. 88, 91, 78 P. 344.) The hearing held completed the procedure in accordance with section 1217 of the Code of Civil Procedure.

The procedure followed in the Lyons case did not comply with section 1211, for the oral 'order to show cause' employed by the judge in that case gave the accused no time to prepare his defense, to obtain assistance, or to marshall evidence in support of his explanation. There is no justification for permitting trial judges to institute contempt proceedings in cases of this kind without providing meaningful notice and time for preparation.

The statutory procedures for contempts as to which the court is not fully informed are entirely adequate for this kind of case, and are therefore controlling. (In re Garner, supra.) Judicial creation of a new procedure, unelaborated by statute or by a background of decided cases, can only add confusion that may easily be avoided by use of the well-defined statutory procedures with which our courts have had extensive experience. Anything less than the protections afforded by these procedures would be inadequate.

**494**

Although the proper procedures for adjudicating the contempt charged in this case were followed, the facts established do not support the judgment. Petitioner was not sole counsel for his client, for the client had retained the firm of Monroe and Chula to represent him and Monroe represented the client before and during the trial. 'We will take judicial notice of the fact that in California it is, and for a long time has been, a general custom sanctioned by recognition of the courts for attorneys at law singly and by firms to employ attorneys at law to assist in legal work placed in their care, including appearances in court without the formality of being made attorneys of record, * * * The simple action of petitioner in line with the established custom neither satisfied the requirements of contempt of court nor the requirements for conviction of that offense.' (*Raskin v. Superior Court*, 138 Cal.App. 668, 670, 33 P.2d 35, 36.) In the Raskin case it was held that a substitute could not be held in contempt merely for appearing as a substitute. Similarly, the principal attorney who procures a competent substitute cannot be held in contempt.

Petitioner testified that he obtained a substitute, an associate in his office, because he was to be away in connection with another case. His testimony was supported by that of his associate and substitute. This testimony is not in conflict with the client's statement that 'I stopped at his office and he said he'd be here at 9:15, but he isn't here.' The court asked only where the client's 'counsel' was, and he did not indicate to whom he had spoken. Since other attorneys than petitioner represented the client, there is no basis for inferring that the client spoke to petitioner rather than to one of the others. Moreover, the client did not say whether he had stopped at petitioner's office on the morning of the hearing or at some previous time.

Had the substitute appeared punctually, there would have been no basis for a contempt charge. Nor can petitioner be punished for his substitute's tardiness unless he authorized or should have fore-

seen it. Even if the facts might support a charge of contempt against the substitute, they do not support such a charge against petitioner.

Of course unexcused absences by counsel cannot be condoned. Even though the record indicates that petitioner has frequently failed to appear in court when he should, he was not charged with such misconduct and it cannot justify holding him in contempt of an order he did not violate.

PETERS and DOOLING, JJ., concur.
*Chula v. Superior Court*, 18 Cal.Rptr. 507, 513–16, 368 P.2d 107, 113–16 (emphasis in original).